IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHELTON FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:15cv786-MHT-TFM |
| | ) | (WO) |
| DENNIS MEEKS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

On September 2, 2015, Plaintiff Shelton Foster ("Plaintiff" or "Foster"), a pre-trial

detainee, filed a "Civil Action pursuant to Title 42 § 1983 [and] pursuant to Title 42

§1331(a) along with Article VII U.S. Constitution" in the Circuit Court of Covington

County, Alabama.[1]  Doc. 1-1. He named Sheriff Dennis Meeks ("Meeks") and Southern

Health Providers as defendants.  On October 26, 2015, Defendant Meeks removed the

case from the Covington County Circuit Court to this court.  Doc. 1.  On October 28,

2015, this court ordered Plaintiff to file an amended complaint which more adequately

describes his specific claims.  Doc. 2.  On November 18, 2015, Plaintiff filed the

Amended Complaint naming Meeks, Captain Preston Hughes ("Hughes"), Nurse Diane

---

[1] In the heading of the initial Complaint, Plaintiff specifically references a case he previously filed in the Covington County Circuit Court (CC-2013-47).

Williams ("Williams"), and Nurse Jennifer Reeves ("Reeves") as defendants.[2]  Doc. 11.

On December 2, 2015, Plaintiff filed an amendment to the Amended Complaint, in which

he asserted additional claims.  Doc. 13.

The defendants filed Special Reports, Answers, and supporting evidentiary

materials, in which they argue that Plaintiff failed to exhaust administrative remedies

available to him while incarcerated at the Covington County Jail. Doc. 43 & 44.  The

court subsequently construed these documents as Motions for Summary Judgment. *See*

*Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008) (Although an exhaustion defense

"is not ordinarily the proper subject for a summary judgment[,]" the defense is

appropriate for summary judgment when the evidence demonstrates administrative

remedies "are absolutely time barred or otherwise clearly infeasible.").  Doc. 52.

On March 10, 2016, counsel for Plaintiff entered a Notice of Appearance.  Doc.

48.  On March 14, 2016, this case was referred to the undersigned for consideration of all

pretrial matters. Doc. 49.  The court permitted counsel to file any documents or pleadings

necessary for a proper prosecution of this case on or before April 29, 2016.  Doc. 51.  No

additional pleadings were filed.  On June 2, 2016, this court ordered that Plaintiff may

file a response to the Motions for Summary Judgment on or before July 1, 2016.  Doc.

52.  On August 2, 2016, Plaintiff's counsel filed a Motion for Extension of Time to File

an Amended Complaint.  Doc. 54.  The court granted the Motion.  Doc. 55.

---

[2] Plaintiff also named Dr. Millard McWhorter as a defendant.  The claims against this defendant were dismissed. Doc. 41.

On August 10, 2016, Plaintiff's counsel filed the Amended Complaint, in which Foster asserts numerous claims of deliberate indifference to the Plaintiff's health in violation of his constitutional rights.  Doc. 56.  In addition, Plaintiff presents state law claims of fraud, outrage, and negligence against the defendants.  *Id.*  He seeks "$20 MILLION DOLLARS in compensatory damages and $100 MILLION DOLLARS in punitive damages." Doc. 56, Pl's Amended Comp., p. 5 (emphasis in original).  As a matter of law, the Amended Complaint filed by counsel for the plaintiff supersedes the Complaint and Amended Complaints previously filed by the plaintiff *pro se*.  *See, e.g., Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016) ("So when [the plaintiff] filed the second amended complaint, the first amended complaint . . . became a legal nullity."); *Schreane v. Middlebrooks*, 522 Fed. Appx. 845 (11th Cir. 2013).

The defendants filed Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on August 24, 2016.  Doc. 59 & 60.  The medical defendants also filed evidentiary materials, including declarations from medical personnel regarding Plaintiff's medical treatment at the jail in support of their argument that they did not act with deliberate indifference to his health and copies of grievances in support of their contention that Foster failed to exhaust his claims prior to filing in this court.  The correctional defendants, however, do not challenge the claims set forth in the Amended Complaint on the basis of Foster's failure to exhaust nor do they contend that several of his claims are barred by the statute of limitations; instead, they argue that the Amended Complaint fails to satisfy the requirements of Fed.R.Civ. 8(a)(2) and 9 and that they are entitled to qualified immunity. On September 27, 2016, out of an abundance of caution, this court ordered that the

Motions to Dismiss with respect to the claims against Meeks, Hughes, Williams, and Southern Health Partners be held in abeyance until the filing of a Motion for Summary Judgment.[3]  On December 9, 2016, the defendants filed Motions for Summary Judgment. Doc. 70 & 72.


## II.  DISCUSSION

### A.      The Claims

The claims as set forth by counsel in the Amended Complaint are as follows:

Count I-V:     42 U.S.C. Section 1983 – Wrongful Denial of Medical Records;
Timely Medical Treatment; Proper Medication; Needed Medical Devices and Procedures & Standard Medical Follow-Up & Care

Count VI:      Fraud

Count VII-VIII:   42 U.S.C. Section 1983 – Abuse of Governmental Authority, Power & Negligent Training of Covington County Jail and Medical Providers at Said Jail

Count IX:      Constitutional Procedural & Substantive Violations

Count X:       42 U.S.C. Section 1983 – Outrage

Doc. 56, Pl's Amended Comp.

---

[3] On September 19, 2016, Plaintiff's counsel filed the Response, in which Foster conceded that the claims against Defendant Reeves should be dismissed.  Doc. 64.  On November 15, 2016, this court dismissed the claims against Defendant Reeves. Doc. 69.

The court acknowledges that the Amended Complaint is not a model of clarity. Nonetheless, it is clear that Foster asserts several claims that the jailers acted with deliberate indifference to his health. Consequently, the Motion to Dismiss filed by Defendants Meeks and Hughes is due to be denied. Doc. 59.

**B.     The Medical Defendants**

**(1)     The Standard of Review**

The medical defendants filed both a motion to dismiss and a motion for summary judgment, in which they assert that this cause of action is due to be dismissed because Foster failed to properly exhaust an administrative remedy available to him at the Covington County Jail.   The medical defendants base their exhaustion defense on the plaintiff's failure to file and/or appeal grievances regarding the claims presently pending before this court as allowed by the jail's grievance procedure before seeking relief from this court.   "[A]n exhaustion defense ... is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'"  *Bryant v. Rich*, 530 F.3d 1368, 1374-1375 (11th Cir. 2008) (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 368–369 (9th Cir.1988)).

"When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true.  'If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.' *Turner v. Burnside,* 541 F.3d 1077, 1082 (11th Cir.2008) (citing *Bryant,* 530 F.3d at 1373–74). If the complaint is not subject to dismissal at this step, then the court should make 'specific findings in order to resolve the disputed factual issues related to exhaustion.' *Id.* (citing *Bryant,* 530 F.3d at 1373-74, 1376)."  *Myles v. Miami-Dade County Correctional and Rehabilitation Dept.*, 476 Fed.Appx. 364, 366 (11th Cir. 2012).

5

Upon review of the undisputed facts of this case as evidenced by the Amended Complaint, the evidentiary materials filed by the medical defendants, and the Response, the court concludes that the Motion to Dismiss filed by Williams and Southern Health Partners is due to be granted.

### (2)    The Failure to Exhaust the Grievance Procedure

Foster challenges his medical treatment and other actions taken against him during his incarceration in the Covington County Jail.  Foster alleges that he either submitted grievances or that he did not receive responses to his grievances regarding the matters set forth in the instant complaint.  However, the evidentiary materials submitted by the defendants, including all grievances filed by Foster during his incarceration, demonstrate that the grievances submitted by Foster either do not address the specific claims presented to this court or were not appealed in a proper manner in accordance with the Covington County Jail policies and procedures.

The Prison Litigation Reform Act compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a §1983 complaint. Specifically, 42 U.S.C. §1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "Congress has provided in § 1997(e)(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies."  *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement.  *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006).

Moreover, "the PLRA exhaustion requirement requires ***proper exhaustion***." *Woodford*, 548 U.S. at 93 (emphasis added). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings.... Construing § 1997e(a) to require proper exhaustion ... fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage." *Id.*, 548 U.S. at 90-91, 93.  The Court reasoned that because proper exhaustion of administrative remedies is necessary an inmate cannot "satisfy the Prison Litigation Reform Act's exhaustion requirement ... by filing an untimely or otherwise procedurally defective administrative grievance or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to her.  *Id.*, 548 U.S. at 83-84, 126 S.Ct. at 2382; *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion

requirement of the PLRA).  "The only facts pertinent to determining whether a prisoner

has satisfied the PLRA's exhaustion requirement are those that existed when he filed his

original complaint." *Smith v. Terry*, 491 Fed.Appx.  81, 83 (11th Cir. 2012) (per curiam).

The record in this case demonstrates that the Covington County Jail provides an

administrative remedy for inmate complaints in the form of an inmate grievance

procedure.  Attach. to Hughes' Declaration, Medical *Defendants' Exhibit A (Policy and*

*Procedure Directive for Inmate Grievances) - Doc. No. 61-1* at 5.  The grievance

procedure allows an inmate to submit grievances to the Jail Administrator with respect to

matters/conditions occurring at the Covington County Jail.  The Covington County Jail

Policy and Procedure Directive provides as follows:

POLICY:

It is the policy of the Covington County Jail that inmates are permitted to
submit grievances to the Jail Administrator and that each grievance will
receive a response.

PROCEDURE:

The Jail Administrator will devise a grievance form to be made available to
all inmates on request.

Inmates must file a completed grievance form within 7 days from the date
of the occurrence upon which the grievance is based.

Completed grievance forms will be delivered to the Jail Administrator who
will respond to the grievance.

The grievance response to the inmate will be in writing.

Once the grievance has been answered by the Jail Administrator a copy of
the answered grievance will be made and returned to the inmate with the
original grievance being placed in the Inmate's file.

The decision of the Jail Administrator may be appealed to the Sheriff in writing within seventy-two hours of the receipt of the grievance decision.

Whole block grievances will not be accepted or answered.  All grievances must come from individual inmates.

*Id*.

The medical defendants submitted records of grievances related to Foster's allegation that they acted with deliberate indifference to his health.  The records indicate that, on December 19, 2012, Foster submitted a grievance form, in which he complained:

Being refused the follow-up per cancer (ENT) doctor with knot behind right ear. Refused follow-up with cardiologist (heart doctor) as per my doctor orders.  Being refused the medi[port] needing flush.  Still heavy congested, in chest nothing else done for that.

Doc. 61-3, p. 64 of 74.  On December 21, 2012, Captain Hughes responded:

All the above are medical issues.  This grievance will be given to the medical staff for an answer.  After which I will be given information as to their findings.

*Id*.  The medical staff subsequently responded:

Mr. Foster,

Going out to see your MD's for follow up visits has been addressed. Our MD wrote an order for you to not go out at this time on 11/28/12.  As for the flushing of your mediport, we do not have a doctor's order to flush it, nor could we verify that you had it flushed other than during bloodwork being drawn which is standard procedure.  If you are having congestion in your chest, you should turn in a sick call to be seen by medical.  You are treated with antibiotics, breathing treatments [and] a medicine for sinus congestion from 12-5-12 to 12-14-12, if this has not resolved your congestion issue, you need to come to sick [call] for re-evaluate.

Thanks,
Medical

*Id*.  Foster did not appeal this grievance.

9

On October 11, 2013, Foster submitted an Inmate Request Form, in which he reminded the staff that he is diabetic and inquired why his name was no longer on the diabetic tray list in the kitchen. Doc. 61-3, p. 65 of 74. Later that day, medical staff responded, "Your name has not been taken off diabetic tray list." *Id*. Foster did not file a grievance against the medical defendants related to this request.

On January 2, 2013, Foster submitted an Inmate Grievance Form complaining of the following:

> I have been refused [further] medical. I had heart problems and need to be seen by cardiologist follow-up.
>
> I also need to be seen by ENT cancer doctor! For I have a knot has come up behind my right ear, also now a smaller spot has on it: They need to be checked out!
>
> The mediport in my chest needs flushing. I on average had it done every 2 months as it has to be flushed to take the blood test checking on blood sugar levels, also Hepatitis C.
>
> I have requested about being able to have denture cleaner for my dentures, all actually got a film from the toothpaste.
>
> I have issues with ear draining, left one. It has been operated on for being busted, also the sweet [*sic*] gland has been removed that also contributed to the draining.
>
> I am trying to follow ya'll guidelines I have been reference these medical issues by the doctor and nurse . . . .
>
> Also haven't heard back from Capt. Hughes. I had placed a request to him 2 weeks ago as of today! Thanks.

Doc. 61-3, p. 66 of 74. The following day, a jailer submitted the form to medical personnel. The nurse responded:

> You haven't been refused any medical treatment during your time here.
> On November 28, 2012, you were evaluated by Dr. McWhorter. He told
> you on that date that you didn't have to be sent out to any other MD at this
> time.   The mediport was only flushed during blood draws before you
> arrived [at] this facility which is standard procedure. This has been
> explained to you on numerous occasions, an MD order is needed to flush
> your port [and] this has also been explained to you.  We have been unable
> to verify any MD that would give an order for routine flushes or any routine
> flushes done prior to your incarceration.  If you are sick, medical needs to
> know by you filling out sick call.  Medical has nothing to do with denture
> cleanser, but it is my understanding that it is not permitted per jail policy.

*Id.*  Foster did not submit an appeal against the medical defendants related to this request.

On April 8, 2014, Foster submitted an Inmate Request Form to the Sheriff, in

which he requested the following:

> I have received several bills from Birmingham per the visit [with]
> prosthesis. I was issued a temporary prosthesis that lasts supply 3 months.
> This one has started leaking. I don't wish to have to go through all the mess
> I did last year.  Anyway this can be handled so someone can order me a
> prosthesis 20-8 I can install myself.

Doc. 61-3, p. 67 of 74.  On April 8, 2014, medical personnel responded "Added to MD

list for 4/9/14. Can discuss [with] him."  *Id.*  Foster did not submit a grievance or appeal

this matter.

On July 15, 2014, Foster submitted an Inmate Request form to Sheriff Meeks and

Captain Hughes, in which he stated:

> Seen ya'll Dr. again today with same results. Nothing.
>
> Diane claims Hughes said I couldn't have a medical shampoo. It is
> your Dr place to order it not my wife's anymore.  I came in here with
> prescription medication shampoo for this rash I keep breaking out with,
> now it is [*illegible*] back behind my ears.  Also Diane finally looked [at]
> left ear to see it was infected upon coming from [hospital] that day.  Still
> nothing checked for dizziness [and] headaches.  Please make a copy and
> forward.

Doc. 61-3, p. 68 of 74.  At some point, jail personnel submitted the form to "Medical".

*Id*.  On July 30, 2014, medical personnel responded, "Dr. McWhorter has reviewed your

request.  Medicated shampoo will be ordered and dispensed as directed."  *Id*.  Foster did

not submit a grievance related to the medicated shampoo or other complaints against the

medical defendants.

On April 11, 2015, Foster submitted an Inmate Request Form to the Chief Jailer,

in which he complained of "problem [with] medical not doing anything about coughing

blood [and that he] went through this mess 28 days last time over a month ago – ENT has

nothing to do [with] lungs."  Doc. 61-3, p. 72 of 74.  On the same day, medical personnel

responded, "You have been placed on MD list for next visit."  *Id*.

On May 15, 2015, Foster submitted an Inmate Request Form, in which he

complained:

> I have a hard time speaking my mind or keep begging for something
> for these headaches or what is causing this to be so bad. They have caused
> blindness in my left eye.  With the sinuses, your Dr. couldn't even look [or]
> diagnosis what the problem is. Now can't even get anything to stop the
> burning, running sinuses, the cold effervescent tablets don't work, makes
> them run worst, they seem to believe the blood I have been coughing up for
> 4 months off & on is caused by my sinuses.  The blood coming from my
> stoma ([*illegible*] lung area) not attached to my sinuses.
>
> I am writing this as a verbal request hoping that something gets
> done.  Why should I suffer worst not being convicted of anything yet –
> detained, charged yes – Even a caged animal needs fresh air occasionally.
>
> Mailed out to have copy made & certified. The request mailed back
> certified so I know it is being seen & not thrown in garbage as one request
> this week seemed to disappear.  Thanks.

Doc. 61-3, p. 71 of 74.  On June 2, 2015, medical personnel responded, "You are down to

see the Dr. tomorrow." *Id*.  Foster did not submit a grievance or otherwise appeal the medical personnel's response.

On June 4, 2015, Foster submitted an Inmate Request Form to the Chief Jailer and Sergeant Benson.  Doc. 61-3, p. 70 of 74.  He requested paperwork, a notary, and a doctor who "can distinguish fact my sinuses aren't attached to lungs and broncile [*sic*] tubes causing cough up of blood." *Id*.  Jail personnel provided copies of the request to both the Sheriff and medical personnel.  *Id*.  On June 8, 2015, medical personnel responded that Foster was "seen by ENT and cleaned."  *Id*.  Foster did not submit a grievance or appeal the related to the medical defendants' actions.

On October 19, 2015, Foster submitted an Inmate Request Form, requesting to see his "medical records" and to "make copies of certain request, Dr. notes, etc. – pertaining to legal case!"  Doc. 61-3, p. 74 of 74.  Medical personnel responded, "You need to contact Southern Health Partners. We are gonna repeat CT scan in 3 months per M.D. order." *Id*.  Foster did not submit a grievance related to this request.[4]

On October 26, 2015, Foster submitted an Inmate Request Form, in which he requested the following:

> I am requesting information to the whereabouts, of my personal breathing equipment, and prescribed albuterol capsules.  The nebulizer was special fitted for my neck [with] hole in it.  The compressor, grey [in] color shape as a small football (name not remembered).  I was told last med. to do a breathing treatment since my inhaler was out.  Was told was ordered, was handed out @ pill a.m. before any express carrier delivered the refusal of a Benadryl cause excessive inflammation neck, throat, which turned to stop – This will be my final plea before I take action.

---

[4]  It is undisputed that Foster did not contact Southern Health Partners for his medical records.  Nonetheless, it is clear that Southern Health Partners has submitted all of its medical records related to this case to Plaintiff as evidentiary materials in this lawsuit.

> Also viral inf. N eye per Dr. Franklin.

Doc. 61-3.  A nurse responded:

> [Inmate] requested for his wife to pick up [illegible] 2 yrs ago which
> Mrs. Foster did.  [Inmate] hasn't had it in 2 yrs & hasn't had issue [with]
> using SHP's machs [*sic*] and hookup. [Inmate] is being treated for
> inflammation on throat.  0 S/S of staff noted.  [Inmate] also was started on
> meds per eye M.D. for viral infection.  This nurse notified MD Dr. Junkins
> . . . [and] he gave [no] new orders at this time.

*Id*.  Foster did not submit a grievance or appeal this matter.

On October 27, 2015, Foster submitted an Inmate Request Form in which he

requested:

> I need to speak to you face to face, also need a picture of this
> infected area on my neck next to my soma that busted last night allowed
> [blood] and pus into my airway while I was asleep, awoke gasping for air,
> coughing . . . masses of pus [and blood] from bronciale [*sic*] and lungs."

Doc. 61-3, p. 69 of 74.  Jail staff responded that a nurse was called at 4:30 a.m. about

Foster's complaints of shortness of breath, that the nurse asked Sergeant Scott to check

his oxygen saturation and respiration rate, and that Foster's saturation rate was 99%, his

respirations were normal, and no distress was noted.  *Id*.  Foster did not submit a

grievance related to the medical defendants' response to his request.

The record before the court demonstrates that Foster failed to properly exhaust the

administrative remedies available to him during his confinement in the Covington County

jail prior to seeking federal relief, a precondition to proceeding in this court on his claims.

Specifically, the court finds that Foster either did not submit grievances or appeal the

grievance decision as permitted by the jail's grievance procedure prior to filing this cause

of action.  In addition, the time for utilizing the grievance procedure with respect to the

claims raised by Foster expired prior to the filing of this case.  Finally, any grievances filed after initiation of this federal cause of action have no bearing on Foster's proper exhaustion of the administrative remedies provided at the Covington County Jail.  *Smith v. Terry*, 491 Fed.Appx. 81, 83 (11th Cir. 2012).  Foster has presented no circumstances which justify his failure to exhaust the jail's grievance procedure prior to filing this case.

Under the circumstances, the court finds that dismissal with prejudice is appropriate.  *Bryant*, 530 F.3d at 1375 n.1 (acknowledging that where administrative remedies are clearly time barred or otherwise infeasible inmate's failure to exhaust may "correctly result in a dismissal with prejudice."); *Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Johnson*, 418 F.3d at 1157 (same); *Berry v. Kerik*, 366 F.3d 85, 88 (2nd Cir. 2004) (footnotes omitted) (indicating inmate's "federal lawsuits ... properly dismissed with prejudice" where previously available "administrative remedies have become unavailable after prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust.").  This court therefore concludes that the Motion to Dismiss filed by Southern Health Partners and Dianne Williams is due to be GRANTED.

### C.  The Jailers

#### (1)  Summary Judgment Standard

Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation omitted); Fed.R.Civ.P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*,

477 U.S. at 324; FED.R.CIV.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine [dispute] for trial.").   A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

To survive the defendants' properly supported motion for summary judgment, the plaintiff is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).   "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra*.   Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).   Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving

party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### (2)   The Facts

Viewed in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the following facts are taken as undisputed for the purpose of summary judgment. Nurse Williams' Declaration, which is supported by the undisputed medical records, summarizes Foster's medical history as follows:

## CHRONOLOGY OF PLAINTIFF'S TREATMENT[5]

16.     Plaintiff was booked into the Jail on September 14, 2012. At booking, he informed the Jail intake officer that he had the following medical conditions: arthritis, diabetes, heart conditions, hepatitis, high blood pressure, cancer ("in recession"), and upper and lower false teeth.

17.     On September 14, 2012, [Williams] conducted an initial medical screening on Plaintiff. Plaintiff informed me that he had the following conditions: migraine headaches, history of a heart attack and open heart surgery with stent placement, a neck fusion, hepatitis C, diabetes, high blood pressure, and a history of throat cancer with a tracheostomy. Plaintiff was placed on a diabetic diet, and was approved to have diabetic shoes in the Jail.

18.     On September 14, 2012, Dr. McWhorter entered orders for Plaintiff's blood pressure to be checked daily for three days, then weekly for four weeks, then monthly. Dr. McWhorter also issued orders for Plaintiff's blood sugar to be checked twice per day for five days. On September 19, 2012, he decreased the blood sugar checks to once per week.

19.     Medical staff have checked and recorded Plaintiff's blood pressure and blood sugar throughout his incarceration according to the Medical Directors' orders.

20.     On September 22, 2012, Nurse Gorum conducted a History and Physical examination of Plaintiff. Plaintiff informed Nurse Gorum that he had been diagnosed with throat cancer, diabetes, chronic pain, hepatitis C, and had a history of a heart attack and stent placement. He stated he was taking the following medications: Vistaril, Metformin, and Percogesic. Nurse Gorum noted that Plaintiff had a tracheostomy (a surgical opening through the neck into the trachea, through which a patient breathes). She also noted that he wore glasses and dentures. Nurse Gorum checked Plaintiff's vital signs: his blood pressure was 126/84, his temperature was 98.0, his pulse was 80, his respirations were 20, and his weight was 191 pounds.

21.     Nurse Gorum placed Plaintiff on the Chronic Care List. This list is for patients with chronic conditions such as diabetes, hepatitis, and high blood pressure. Patients in Chronic Care are seen at least every three months by the Jail physician ("Chronic Care Clinic"), and the patients

---

[5] The summarization of Foster's medical history begins at paragraph number 16 in Williams' declaration.

are monitored regularly as to their vital signs, medications, medication compliance, special diets, condition control, and laboratory data ("Chronic Disease Flow Protocol"). Plaintiff has been on the Chronic Care List, has been monitored according to the Chronic Disease Protocol, and has been seen in the Chronic Care Clinic on a regular basis throughout his incarceration in the Jail.

22.    On November 23, 2012, I obtained Plaintiff's medical records of his last visit with Dr. Jack Lurton, M.D., of Pensacola Ear, Nose and Throat. Dr. Lurton's records revealed that Plaintiff had undergone two neck dissections and a parotidectomy. He noted that Plaintiff wore a TEP (transesophageal prosthesis, or "voice box") that "kind of frustrates him, but he has pretty good voice." Dr. Lurton also noted that occasionally, Plaintiff would cough some blood from his stoma (surgical opening in the neck for breathing). [Williams] also obtained Plaintiff's medical records from Sacred Heart Medical Group. These records indicated that Plaintiff had been treated for coronary artery disease, cervical spine herniation, throat cancer, hypertension, depression, migraines, hypertension, thrush pharyngitis, chronic back pain and diabetes. Medications included proton pump inhibitors, pain medications, a sleeping pill, a muscle relaxant and an antihistamine.

23.    From September 14, 2012, to July 20, 2013, Plaintiff received extensive medical treatment from Dr. McWhorter and the SHP Jail staff. He was provided the following medications: Ibuprofen (for headaches), Vistaril (for anxiety and itching), Phenergan (for nausea), Metformin (for diabetes), Aceta-Gesic (for pain), tramadol (for pain), loratidine (for allergies), HCTZ (hydrochlorothiazide, for high blood pressure), amitriptyline (for depression), Amoxil (an antibiotic), Cipro (an antibiotic), Bactrim DS (an antibiotic), cephalexin (an antibiotic), Chlor-Trimeton (for allergies), albuterol breathing treatments (for asthma), albuterol inhaler (for asthma), Zantac (to reduce stomach acid), Azithromycin (an antibiotic), Benadryl (an antihistamine, for allergies), Triamcinolone cream (for rash), aspirin (blood thinner), lice treatment, and multivitamins. His blood sugar was checked weekly, and his medications, medical condition, diet, and vital signs (blood pressure, temperature, respirations, weight, and oxygen saturations) were checked and reviewed every three months in Chronic Care Clinic. In addition to his Chronic Care visits, he was seen in the Jail medical office numerous times during this period for headaches, congestion, skin rashes, scabies, earaches, urinary problems, and skin lesions.

24.    On December 19, 2012, Plaintiff submitted a grievance form to Jail staff,

stating, "Being refused the follow-up per cancer (ENT) Doctor with knot behind left ear, Refused follow up with Cardiologist (heart doctor) as per my doctor orders, Being refused the mediport needing flush, Still heavy congested, in chest, nothing else done for that." Medical responded to this grievance, stating "Mr. Foster, Going out to see your MD's for follow-up visits has been addressed, our MD wrote an order for you not to go out at this time on 11/28/12. As for the flushing of your mediport, we do not have a doctor's order to flush it, nor could we verify that you had it flushed other than during bloodwork being drawn which is standard procedure. If you are having congestion in your chest, you should turn in a sick call to be seen by medical. You were treated with antibiotics, breathing treatments & a medicine for sinus congestions from 12-5- 12 to 12-14-12, if this has not resolved your congestion issue, you need to come in to sick call for re-evaluation. Thanks, Medical." Medical responded in writing to this grievance, stating, "You haven't been refused any medical treatment during your time here. On 11/28/12 you were evaluated by Dr. McWhorter, he told you on that date that you didn't have to be sent out to any other MD at this time. The mediport was only flushed during blood draws before you arrived @ this facility which is standard procedure, this has been explained to you on numerous occasions, an MD order is needed to flush your port & this also has been explained to you. We have been unable to verify any MD that would give an order for routine flushes or any routine flushes done prior to your incarceration. If you are sick medical needs to know by you filling out a sick call. Medical has nothing to do with denture cleanser, but it is my understanding that it is not permitted per jail policy." Plaintiff did not appeal this grievance.

25.     On January 2, 2013, Plaintiff submitted an Inmate Grievance Form to the Jail, stating, "I have been refused of other medical, I had heart problems and need to be seen by cardiologist follow up. I also need to be seen by ENT cancer doctor! (For I have a knot has come up behind my right ear; also now a smaller knot below it; they need to be checked out! The medi pert in my chest needs flushing, in average had in done every two months as it has to be flushed to take the blood test checking on blood sugar levels, also Hepatitis C. I have requested about being able to have denture cleaner, for my dentures, are actually got a film from the toothpaste. I have issues with ear draining, left one, it has been operated on for being busted, also the sweat gland has been removed that also contributed to the draining. I am trying to follow y'all guidelines I have been refused these medical issues by the Doctor and Nurse Pam. Also haven't heard back from Capt. Hughes, I had placed a request to him 2 weeks ago as of today! Thanks."

21

26.     On January 31, 2013, x-rays were taken of Plaintiff's neck. The radiologist reported that the x-rays showed no abnormalities other than degenerative disc disease and a previous cervical spinal fusion.

27.     On May 22, 2013, Plaintiff informed Nurse Reeves he had inhaled his "trach." Plaintiff was taken to a hospital emergency room for removal by Dr. Tara Harden, M.D. ("Dr. Harden"). Plaintiff was returned to the Jail the same evening. Shortly after his return to the Jail, he complained that he did not have the piece to his "trach" that keeps fluid and food from going into his lungs. Nurse Reeves called Dr. Harden, who stated she had never heard of this and saw no reason he needed it. The next day, Nurse Reeves called the office of Plaintiff's ENT (Ear, Nose and Throat specialist) and talked to the nurse. The nurse informed Nurse Reeves that the only thing in Plaintiff's throat from his laryngectomy was a "voice box" (TEP, or voice prosthesis), and that the voice box being out would not cause him to get food or water into his lungs. She stated that without it, Plaintiff might not be able to talk, but no harm would come to him from its absence. Nurse Reeves informed the ENT nurse that Plaintiff could still talk without the device.

28.     Later, Nurse Reeves informed Plaintiff what she had been told by Dr. Harden and the ENT nurse. Plaintiff became very upset. He went to the sink and got some water, and started blowing it out of his stoma (neck opening) at the cell window towards the nurse.

29.     After May 22, 2013, Plaintiff continued to be able to talk without the use of a voice prosthesis.

30.     On May 24, 2013, pursuant to orders from Dr. McWhorter, [Williams] contacted the emergency room to arrange for a replacement of Plaintiff's voice prosthesis. The emergency room nurse informed me that Plaintiff had an established stoma, and therefore had no need for a throat prosthesis, and that he had not had one for over twenty years. [Williams] contacted Dr. McWhorter, and informed him of my conversation with the emergency room, and Dr. McWhorter discontinued the order for the prosthesis replacement.

31.     On June 25, 2013, an inmate, Dustin Beverly, submitted a statement to Jail staff, stating that Plaintiff had intentionally "caused his trach diaphragm to be sucked into his lungs." Inmate Beverly stated that Plaintiff had been talking about it the night before "so that he could get out of jail."

32.    On July 17, 2013, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of a pruritic rash, and breaking out in nodules. Dr. McWhorter observed a rash in Plaintiff's axilla and abdomen. He issued medical orders for Triamcinolone cream, to be applied twice per day for fourteen days.

33.    On July 30, 2013, Plaintiff submitted a Sick Call Slip, stating "soreness of my neck, along with soreness of my throat, rash, back hurts, (knots are very sore, the second small one on left side has small drainage on neck)." Plaintiff was referred by the Jail nurse to be seen by Dr. McWhorter for his complaints.

34.    On July 31, 2013, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of knots on his neck and a rash. Dr. McWhorter noted that the rash was dermatitis that was already being treated. He ordered that Plaintiff continue his current medications.

35.    In July 2013, Plaintiff was provided the following medications: Bactrim, body lice treatment, Multivitamin, HCTZ, Loratidine (Claritin), Metformin, Tramadol, aspirin, and albuterol breathing treatments.

36.    On August 1, 2013, Plaintiff submitted a Sick Call Slip, stating "I am requesting a second opinion from a qualified doctor able to fully do his job and listen before saying he not gonna do anything. Rash, knots neck, trouble pissing, congestion." [Williams] responded that Plaintiff had been seen on July 31, 2013 for these same complaints, and that no treatment had been ordered.

37.    On August 5, 2013, Plaintiff submitted a Sick Call Slip, stating "Spot under arm again, infected spots on stomach, throat so sore barely swallow, knots on neck get worst, rash leaving small sores all over."

38.    On August 7, 2013, [Williams] saw Plaintiff in the Jail medical office. I completed a Clinical Pathway Form for skin lesions. I observed nothing under Plaintiff's right arm, and noted that no treatment was indicated.

39.    On August 8, 2013, Dr. McWhorter issued medical orders to discontinue Claritin when Plaintiff's current supply ran out.

40.    On August 12, 2013, Plaintiff submitted a Sick Call Slip, stating "The

urinating is still burning, sprinkle dribble at first, harder at some times. Drainage behind my left ear, now I have a knot in left breast that is very sore this has never happen before these sores seem to be getting worst again (breaking out) Knots behind the ears are sore! Sore throat!"

41.     Nurse Reeves saw Plaintiff in the Jail medical office on August 14, 2013. She completed a Clinical Pathway Form for urinary tract discomfort. She checked Plaintiff's urine, and the results did not indicate the presence of an infection. She referred Plaintiff to be seen by the doctor for his other complaints.

42.     On August 14, 2013, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of a rash. Dr. McWhorter observed a pruritic rash over Plaintiff's back and extremities. He diagnosed the rash as dermatitis, and issued orders for Plaintiff to be given Claritin.

43.     On August 30, 2013, Plaintiff submitted a Sick Call Slip, stating "Left ear draining bad & sore, got balance messed up, also got another knot in breast right one this time inflamed bad."

44.     On August 31, 2013, [Williams] saw Plaintiff in the Jail medical office, and completed a Clinical Pathway Form for earache. I noted that Plaintiff's left tympanic membrane was red, shiny and bulging. Pursuant to medical orders, [Williams] initiated treatment with Amoxil 500 mg, one tablet per morning and two tablets per evening for ten days.

45.     In August 2013, Plaintiff was provided the following medications: Multivitamins, MCTZ, Loratidine (Claritin), Triamcinolone cream, Metformin, Tramadol, aspirin, Amoxil, and albuterol breathing treatments.

46.     On September 18, 2013, Plaintiff was on the sick call list to be seen by Dr. McWhorter. Plaintiff gave me a letter stating he wanted to be taken off the sick call list. I spoke with Plaintiff, who agreed to see Dr. McWhorter for chronic care. Plaintiff stated, "If I don't like what he says I'm just not going to worry about it, I'll just leave it to the Lord."

47.     On September 18, 2013, Dr. McWhorter issued medical orders for Triamcinolone cream, to be applied twice per day for ten days. He also ordered Nizoral medicated shampoo, to be applied twice per day.

48.     On September 19, 2013, Plaintiff refused his morning medications at pill

call.

49.    On September 20, 2013, Plaintiff submitted a Sick Call Slip, stating "I need to cut these ingrown toe nails on left big toe & right big toe. They don't have anything that opens enough for these thick nails." On September 23, 2013, [Williams] responded "I/M brought up to use toe nail clippers. No SS (signs or symptoms) of infection."

50.    In September 2013, Plaintiff was administered the following medications: Multivitamin, HCTZ, Metformin, Tramadol, aspirin, albuterol breathing treatments, Amoxil, and Triamcinolone cream.

51.    On October 6, 2013, Covington County Circuit Judge Charles A. Short entered an order requiring Covington County to have Plaintiff seen by a physician "that treats Plaintiff's throat condition" and to provide Plaintiff with a throat prosthesis.

52.    On October 11, 2013, Plaintiff submitted an Inmate Request Form, stating, "Just a reminder I'm diabetic & wondering why my name has been taken off diabetic tray list in kitchen!" On the same day, medical responded, "Your name has not been taken off Diabetic tray list."

53.    On October 19, 2013, Plaintiff submitted a Sick Call Slip, stating "Badly congested, wondering when they gonna get prosthesis due to court order! Need toenail clippers rash getting bad again, dandruff shampoo off store don't work!" Nurse Reeves responded that Plaintiff was seen in the Jail medical office on October 20, 2013, and only wanted to be seen about the rash.

54.    On October 20, 2013, Nurse Reeves saw Plaintiff in the Jail medical office. Plaintiff complained of a rash to his arms, legs and head. Nurse Reeves completed a Clinical Pathway Form for dermatitis. She noted slightly raised red areas to Plaintiff's arms, legs and trunk. Pursuant to medical orders, Nurse Reeves provided Plaintiff with one tube of Triamcinolone Acetonide cream, 0.1%.

55.    On October 23, 2013, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of an itching rash. Dr. McWhorter diagnosed Plaintiff with dermatitis, and noted that Plaintiff had been given cream for the problem. Dr. McWhorter also entered medical orders for Plaintiff to undergo a surgical consult with Dr. Harden for a replacement throat prosthesis.

56.    On October 24, 2013, Dr. Harden, the emergency room physician at Andalusia Medical Center signed a letter, stating that she did not perform surgery to implant prosthesis devices to improve speech. Dr. Harden recommended that Plaintiff see an ENT specialist. Dr. McWhorter received the letter on October 30, 2013.

57.    In October 2013, Plaintiff was provided the following medications: Multivitamin, Cephalexin, HCTZ, Triamcinolone cream, Metformin, Tramadol, and albuterol breathing treatments.

58.    On November 1, 2013, Plaintiff submitted a Sick Call Slip, stating, "Left ear draining again, area around the mediport sore, Boil? Needs lancing, very sore on back."

59.    On November 5, 2013, Nurse Reeves saw Plaintiff in the Jail medical office for a swollen, tender, bleeding lesion to his upper back. She placed Plaintiff on a wound care protocol, and referred him to be seen by the doctor on November 6, 2013. She received and initiated medical orders for Bactrim DS, twice per day for ten days, and ibuprofen 800 mg twice per day for five days.

60.    On November 6, 2013, Dr. McWhorter saw Plaintiff in the Jail medical office. He observed that Plaintiff had a draining abscess on his mid back from a spider bite. Dr. McWhorter issued medical orders for Rocephin, 1 gram intramuscular injection.

61.    From November 5, 2013, to December 4, 2013, Plaintiff was seen in the Jail medical office for wound care to a two (2) centimeter lesion to his mid-to-upper back.

62.    Nurse Reeves contacted Dr. McQueen's office on November 19, 2013, to inquire about replacing Plaintiff's voice prosthesis. Dr. McQueen informed Nurse Reeves that they referred all patients to Dr. Woodworth at UAB. Dr. McQueen also stated that if Plaintiff could talk, he did not need the prosthesis.

63.    On November 21, 2013, Nurse Reeves contacted the UAB Health Center, and was informed that Dr. Woodworth would need to speak with Dr. McWhorter about the referral.

64.    On November 22, 2013, Plaintiff submitted a Sick Call Slip, stating "throat sore & irritated, having to continuously keep the hole open where

the prosthesis fits, by allowing me to talk right now, I need the prosthesis, losing weight again the few weeks I have used salt to gargle due to sore throat."

65.     On November 23, 2013, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of his throat being irritated due to trying to keep his stoma open to talk. [Williams] noted that Plaintiff was in the process of attempting to obtain a prosthesis. [She] observed no drainage, redness or edema to Plaintiff's left tympanic membrane. Plaintiff's respirations were unlabored, and his lung sounds were clear. He had no throat redness, no swollen tonsils, no exudate, and no swollen or tender glands. Pursuant to medical orders from Dr. McWhorter, no treatment was indicated.

66.     On November 23, 2013, Dr. McWhorter issued medical orders for Plaintiff to be administered the influenza vaccination.

67.     In November 2013, Plaintiff was provided the following medications: Multivitamin, HCTZ, Triamcinolone cream, Metformin, Tramadol, albuterol breathing treatments, Bactrim DS, ibuprofen, Minocycline, Rocephin, aspirin, flu vaccine, and Tylenol.

68.     On December 4, 2013, Dr. McWhorter contacted UAB, but was unable to speak with Dr. Woodworth. Dr. McWhorter was informed that Dr. Woodworth would return his call.

69.     On December 4, 2013, Plaintiff submitted a Sick Call Slip, stating "Drainage from inside & behind left ear, knot behind both ears sore, sore throat, headaches, lower back for some reason hurting worst that usual, naseau (3 days)."

70.     On December 6, 2013, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of pain in his lower back, and a strong odor from his urine. [Williams] completed a Clinical Pathway Form for urinary tract discomfort. [Williams] noted that [she] performed a urine dip test, which showed a Ph of 5, and specific gravity of 1.005. I also completed a Clinical Pathway Form for upper respiratory symptoms. Plaintiff also complained of clear drainage in his throat, earache, sore throat, and pressure. [Williams] observed no drainage, redness or edema to Plaintiff's left tympanic membrane. Plaintiff's respirations were unlabored, and his lung sounds were clear. He had no throat redness, no swollen tonsils, no exudate, and no swollen or

tender glands. Pursuant to medical orders, no treatment was indicated.

71.   On December 8, 2013, Plaintiff submitted a Sick Call Slip, stating "Sysc on face (chin) Numerous spots itching like fire." Nurse Reeves responded that Plaintiff was seen in the medical office on December 10, 2013.

72.   On December 10, 2013, Nurse Reeves saw Plaintiff in the Jail medical office. She observed a football shaped lesion, about 5 cm x 4 cm in size, on Plaintiff's left temporomandibular area. Pursuant to medical orders, she provided Plaintiff with Bactrim DS for ten days.

73.   On December 11, 2013, Plaintiff submitted a Sick Call Slip, stating "I asked Dr About these headaches getting worst & these bumps itching & burning / no reply after Nurse told him chronic care. I need a roll of my tape." [Williams] responded that Plaintiff was seen by medical on December 14, 2013.

74.   On December 14, 2013, Nurse Reeves saw Plaintiff in the Jail medical office. Plaintiff complained of itching and redness to his legs and arms. Nurse Reeves completed a Clinical Pathway Form, noting that she observed a tiny, very slightly red, scaly area to the back of Plaintiff's right leg. She noted that per medical orders, no treatment was indicated.

75.   On December 18, 2013, Dr. McWhorter issued medical orders for weekly blood sugar checks.

76.   On December 20, 2013, Plaintiff submitted a Sick Call Slip, stating "In Grown toe nail, need to get to my cutters & lifting tool, need cortisone & tape. Don't forget me! I also need sugar ck'd." [Williams] responded on December 22, 2013 that Plaintiff's blood sugar was 124. [She] noted that Plaintiff was allowed to use toenail clippers on December 21, 2013. [Williams] also noted that when Plaintiff was brought to sick call, he had no further complaints, other than to check on his appointment for a prosthesis. [Williams] explained to him that the appointment had been made.

77.   On December 23, 2013, Plaintiff was seen at UAB Health Center outpatient clinic by Dr. Richard Waguespack ("Dr. Waguespack"). Plaintiff reported that his TEP (voice prosthesis) had become dislodged and had not been replaced. Dr. Waguespack noted that Plaintiff's speech and voice quality were within normal limits with no deficits

intelligibility deficits. He replaced the prosthesis without incident.

78. On December 25, 2013, Plaintiff submitted a Sick Call Slip, stating "Not sure, several times this week at a moment, I break out in a clod, clamy, hard sweat, get very weak, hard to breathe, I have today laid around not feeling well, at prayer call this happen'd again." Nurse Reeves responded that Plaintiff was seen by medical on December 28, 2013.

79. On December 23, 2013, radiologist Dr. Charles Barrett reported that the CT of Plaintiff's neck showed no evidence of residual or metastatic disease.

80. On December 27, 2013, Dr. McWhorter issued medical orders for Plaintiff's Hemoglobin A1C to be checked every three months.

81. On December 28, 2013, Nurse Reeves saw Plaintiff in the Jail medical office for sick call. Plaintiff stated that he was having trouble breathing. Nurse Reeves noted that Plaintiff had been caught the previous week with a cigarette in his mouth, and had been caught the night before with tobacco in his cell. Nurse Reeves noted that she would do teaching with Plaintiff on the dangers of smoking.

82. In December 2013, Plaintiff was provided the following medications: Multivitamins, HCTZ, Metformin, Tramadol, aspirin, albuterol breathing treatments, and Bactrim DS.

83. On January 4, 2014, Plaintiff submitted a Sick Call Slip, stating "burning, Itching, small bumps comes up – area around them. I'm afraid it the mites or something close. (possible to get some shampoo) what I used last time to stop all this." [Williams] saw Plaintiff in the medical office that day. [She] observed red, scaly, raised bumps with clear fluid on his arms and trunk. [Williams] saw no evidence of lice or nits in his hair or clothing. [She] provided Plaintiff with lice shampoo to use as directed.

84. On January 8, 2014, Plaintiff was seen in the Jail medical office by Dr. McWhorter. Plaintiff complained of "scabies." Dr. McWhorter noted that Plaintiff had received treatment for the scabies.

85. On January 9, 2014, the laboratory at Andalusia Hospital reported that Plaintiff's Hemoglobin A1C level (tested to monitor Plaintiff's average blood sugar levels) was 5.7, which, according to the laboratory report,

was within normal range for a patient with diabetes.

86.    On January 11, 2014, Plaintiff submitted a Sick Call Slip, stating "Burning, hard to urinate, very light, slow at first, stomach cramps." [Williams] responded that Plaintiff was seen in the medical office on January 15, 2014.

87.    On January 15, 2014, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of burning with urination, and pain in his lower abdomen. [Williams] tested his urine, and noted Ph of 7.5, Specific Gravity of 1.005. [She] advised Plaintiff to push fluids. Plaintiff stated "I don't like this water. I don't see why they won't let Katie bring me a case of water up here." [Williams] advised Plaintiff to alert staff of any changes to his condition.

88.    In January 2014, Plaintiff was provided the following medications: Multivitamin, HCTZ, Metformin, Tramadol, and albuterol breathing treatments.

89.    On February 1, 2014, Dr. McWhorter issued medical orders for Lisinopril 20 mg, twice per day.

90.    On February 3, 2014, Plaintiff submitted a Sick Call Slip, stating "Headaches are getting worst, I told nurse several times & requested to talk to Doc." I responded that Plaintiff had been referred to the doctor.

91.    On February 4, 2014, correctional officers found Plaintiff in possession of a full bag of tobacco and cigarettes, wrapped with the medical tape that was used for his prosthesis. Nurse Reeves instructed the correctional officers to keep the medical tape in the pod and to give it to Plaintiff one piece at a time, as needed.

92.    On February 12, 2014, Plaintiff was seen by Dr. McWhorter in the Jail medical office. Plaintiff complained of a headache. Dr. McWhorter noted that Plaintiff was already on Ultram for headaches, and that the Ultram should be fixing the headaches.

93.    On February 19, 2014, Plaintiff submitted a Sick Call Slip, stating "I have asked numerous times, even trying to explain to Dr these headaches, are worst (10-12 tylenols a day), also about the ear plugs with a stoma to keep them from going down my open air pipe while asleep (med got me worn out almost got stuck down in my ear when

string came loose) I have also asked about my ankle bandage I been wearing for 30 yr due to ankle being shattered, now very bruised & painful. Ear plugs & ankle was approved by Nurse Pam & done in earlier days of my incarceration."

94.    On February 21, 2014, [Williams] saw Plaintiff in the Jail medical office for his complaints of headaches. [She] completed a Clinical Pathway Form, noting that Plaintiff was alert and oriented, with a steady gait and station. His pupils were equal and reactive, and his extraocular muscles were intact. He displayed no photophobia or weakness. His blood pressure was 148/100, his pulse was 76, his respirations were 18, and his temperature was 97.8. [She] notified Dr. McWhorter of the elevated blood pressure. Dr. McWhorter ordered blood pressure checks daily for five days. He also ordered Lisinopril 20 mg, one tablet twice per day. [Williams] also noted that Plaintiff's wife was to bring him a new ankle brace. [Williams] explained to him that it was not up to medical to approve ear plugs.

95.    On February 26, 2014, Plaintiff submitted a Sick Call Slip, stating, "Headaches, lightheadedness, need to find out cause." I saw Plaintiff on March 1, 2014 and checked his vital signs. His temperature was 97.4, his respirations were 18, his pulse was 100, and his blood pressure was 100/70. [Williams] referred him to be seen by the doctor, and noted that it was time for a chronic care visit.

96.    On February 26, 2014, Dr. McWhorter issued medical orders for Plaintiff's blood pressure to be checked every other day for seven days. The medical staff checked Plaintiff's blood pressure as per Dr. McWhorter's orders.

97.    In February 2014, Plaintiff was provided the following medications: Multivitamin, HCTZ, Metformin, Tramadol, aspirin, albuterol breathing treatments, albuterol inhaler, and Lisinopril. On March 3, 2014, Dr. McWhorter issued medical orders for Plaintiff's dosage of Lisinopril to be reduced from 20 mg to 10 mg.

98.    On March 13, 2014, Plaintiff submitted a Sick Call Slip, stating, "this morning I awoke not realizing upon wiping my throat my prosthesis wasn't in my throat till pill call, this leaves me again w/o voice prosthesis, valve to stop fluids from getting in my airway." [Williams] responded that [she] had spoken to Dr. McWhorter, and received permission for Plaintiff's wife to bring him a prosthesis.

31

99.    In March 2014, Plaintiff was administered the following medications: Multivitamin, Ceftriaxone (Rocephin), HCTZ, Metformin, Tramadol (Ultram), aspirin, albuterol  breathing treatments, Lisinopril, and albuterol inhaler.

100.    On April 1, 2014, the laboratory at Andalusia Hospital reported that Plaintiff's Hemoglobin A1C level (tested to monitor Plaintiff's average blood sugar levels) was 5.7, which, according to the laboratory report, was within normal range for a patient with diabetes.

101.    On April 8, 2014, Plaintiff submitted a Sick Call Slip, stating, "Prosthesis is leaking temporary are only good for ruffly 3 months, 2 toes on left foot is burning on the end feels like some hit them w/ hammer" (sic). Medical staff responded that Plaintiff had been referred to the doctor.

102.    On April 8, 2014, Plaintiff submitted an Inmate Request Form to the Jail, stating, "I have received several bills from Birmingham for the visit w/ prosthesis, I was issued a temporary prosthesis that lasts ruffly [*sic*] 3 months this one has started leaking, I don't wish to have to go through all the mess I did last year, anyway this can be handled so someone can order me a prosthesis 20-8 so I can install myself Thanks Shelton Foster" (sic).   On April 8, 2014, Medical  responded to this request, stating, "Added to MD list for 4/9/14 can discuss w/ him."

103.    On April 10, 2014, Plaintiff submitted a Sick Call Slip, stating "This evening 7 times so far in last 4 hrs I have gotten dizzy, light headed to the extent of not staying stood up/last broke out in hard sweat."

104.    On April 12, 2014, [Williams] saw Plaintiff in the medical office, and completed a Clinical Pathway Form concerning Plaintiff's complaint of dizziness. [Williams] observed that Plaintiff blood sugar was 103. His blood pressure was 110/70, his pulse was 66, his respirations were 16, and his oxygen saturation was 98%. He was alert and oriented, and his gait and station were steady. [Williams] instructed him to notify staff so that his blood sugar could be checked while he was having a dizzy episode.

105.    On April 13, 2014, Plaintiff submitted a Sick Call Slip, stating "wife got information where the Dr from Birm. Called in prescription for prosthesis for 2 yrs worth of these temp they don't handle permanent

ones."

106. On April 15, 2015, Nurse Reeves contacted a speech pathologist at UAB (University of Alabama Birmingham), who informed her that a voice prosthesis should be replaced every six weeks. Nurse Reeves proceeded to order replacement prosthesis for Plaintiff.

107. On April 18, 2014, Plaintiff submitted a Sick Call Slip, stating, "Got light headed last night bad for almost an hour, Stg took blood sugar was 117, wondering about blood pressure possibly dropping, also have noticed the headaches came on quiet severly yesterday just before." Nurse Reeves responded the next day, "Had to draw lab on I/M checked BP 120/80 at 09:30 am.  Skin w/d to touch.  No signs or symptoms of hypo/hyperglycemia noted."

108. On April 26, 2014, Plaintiff submitted a Sick Call Slip, stating, "Prosthesis is leaking worst, I like to know the results of the blood test heart enzymes, Hep-C count, etc." [Williams] had Plaintiff brought to the medical office and informed him of the lab results. While Plaintiff was there, he complained of a "bump" on his back. [Williams] observed a red raised area to Plaintiff's upper right back. Pursuant to medical orders, [Williams] initiated antibiotic therapy with Bactrim, one tablet twice per day for seven days. Plaintiff stated . . . that "They were supposed to check my heart enzymes and Hep level." [She] explained to Plaintiff that the only blood work done was what had been ordered by the doctor.

109. In April 2014, Plaintiff was provided the following medications: Multivitamin, Ceftriaxone, HCTZ, Lisinopril, Metformin, Tramadol, aspirin, albuterol breathing treatments, and Bactrim.

110. On May 1, 2014, Plaintiff submitted a Sick Call Slip, stating, "Started coughing blood Tuesday night, got worst yesterday, during a cough spell, I guess the prosthesis came out into tissue am w/o now, hurt in left lung area."

111. On May 2, 2014, [Williams] saw Plaintiff in the Jail medical office, and completed a Clinical Pathway Form for Plaintiff's complaint. [Williams] noted that Plaintiff's lung sounds were clear. He had no pain upon palpation of his sinuses, no throat redness, no swollen tonsils, no swollen or tender glands, and no exudate. Plaintiff also had no pain with neck movement. [Williams] referred Plaintiff to the doctor, and advised

him to notify medical if his condition changed.

112.   On May 7, 2014, Plaintiff refused a diabetic diet. He stated, "I don't like any of the food on this diet, I will starve to death on this diet." Nurse Reeves responded that she would talk to the doctor.

113.   On May 7, 2014, Plaintiff was seen in the Jail medical office by Dr. McWhorter. Plaintiff complained of hemoptysis (coughing up blood). Dr. McWhorter noted that Plaintiff had no documented history of hemoptysis, and that his chest was clear.

114.   In May 2014, Plaintiff was administered the following medications: Multivitamin, Lisinopril, Metformin, Tramadol (Ultram), HCTZ, Bactrim DS, aspirin, albuterol inhaler, and albuterol breathing treatments.

115.   On June 3, 2014, Plaintiff submitted a Sick Call Slip, stating, "Cramping up in spots bad, it acts like low potassium (had it before several times)." Nurse Reeves responded that Plaintiff had been referred to see the doctor on June 11, 2014.

116.   On June 11, 2014, Plaintiff was seen in the Jail medical office by Dr. McWhorter. Plaintiff complained of cramps. Dr. McWhorter noted that it was probably hypokalemia (low potassium) and prescribed Micro K, (potassium chloride) 8 mg daily.

117.   On June 18, 2014, Plaintiff submitted a Sick Call Slip stating, "Left ear draining BR fluid Rash I had had all along is getting worst, fills like it is in right eye lid corner, It is now in my sinuses down behind my ears, neck, about my nose & mouth this dandruff shampoo off their store is no good." [Williams] responded on June 19, 2014, that Plaintiff had been referred to the doctor. [She] also noted that Plaintiff's wife would be allowed to bring in some medicated shampoo.

118.   In June 2014, Plaintiff was provided the following medications: Multivitamin tablet, HCTZ, Lisinopril, Metformin, Tramadol (Ultram), aspirin, albuterol inhaler, albuterol breathing treatment, and KCL (potassium).

119.   Plaintiff was seen in the Jail medical office by Dr. McWhorter on June 25, 2014. Plaintiff complained of dizziness and lightheadedness. Dr. McWhorter observed nothing of concern, and referred to Plaintiff's

master problem list.

120.    On July 3, 2015, Plaintiff was seen in the Jail medical office by me for chronic care. He complained of dizziness, and stated, "I think it's my blood sugar getting too low. When Jennifer checked it yesterday morning, it was 84. I had eaten some candy to get it up to that." [Williams] contacted Dr. McWhorter, who issued medical orders to decrease Plaintiff's dosage of Metformin to 500 mg.

121.    On July 9, 2014, Plaintiff submitted a Sick Call Slip, stating "Prosthesis started leaking a little bit today, so go ahead get another please. Thanks. Rash coming back again on face & sinuses." [Williams] responded that Plaintiff had been brought to the medical office for a prosthesis change. [She] completed a Clinical Pathway Form for Plaintiff's complaints of itching and redness to his neck and face. [Williams] observed that his skin was red, flaky and scaly, with no drainage. Pursuant to medical orders, [Williams] provided Plaintiff with Triamcinolone cream, to apply twice per day.

122.    On July 10, 2014, Plaintiff was brought to the Jail medical office to change his voice prosthesis. While Plaintiff was waiting in a holding cell with a corrections officer, he started coughing and blowing and stated that he had swallowed a piece of his prosthesis. [Williams] contacted Dr. McWhorter, who issued medical orders for Plaintiff to be taken to the emergency room.

123.    On July 10, 2014, Plaintiff was transported to the Emergency Room at Andalusia Regional Hospital, where he was seen by Dr. Harden. Dr. Harden, under local anesthesia with lidocaine, used a bronchoscope to remove a stoma plug (a device that plugs the opening betweenthe esophagus and trachea) from Plaintiff's right main bronchus. She discharged Plaintiff to be released back to the Jail immediately after the procedure.

124.     After Plaintiff returned to the Jail on July 10, 2014, [Williams] attempted to have Plaintiff insert a new voice prosthesis. Plaintiff refused the prosthesis, stating, "Just give me the old one back I'll use it if I need it."

125.    On July 15, 2014, Plaintiff submitted an Inmate Request Form, stating, "Seen y'all Dr. again today with same results nothing. – Diane claims Hughes said I couldn't have a medicated shampoo, it is your Dr place to order it not my wife's anymore, I came in there with prescription

medication shampoo for this rash I keep breaking out with, now it is on my back behind my ears, also Diane finally looked @ left ear to see it was infected upon coming from hospital that day. Still nothing checked for dizziness & headaches. Please make a copy & forward." On July 30, 2014, Medical responded, stating, "Dr. McWhorter has reviewed your request. Medicated shampoo will be ordered and dispensed as directed."

126.    In July 2014, Plaintiff was administered the following medications: HCTZ, Klor- Con, Lisinopril, Metformin, Tramadol, Xopenex, albuterol inhaler, aspirin, and Triamcinolone cream.

127.    On August 6, 2014, Dr. McWhorter issued medical orders for Plaintiff to be provided T-Gel shampoo, one tablespoon twice per week.

128.    Plaintiff refused to allow his blood sugar to be checked on June 25, 2014 and August 6, 2014. Otherwise, his Plaintiff's blood sugar was checked at least weekly during the year 2014, as per orders from Dr. McWhorter.

129.    On August 20, 2014, Dr. McWhorter issued medical orders to discontinue Plaintiff's Ultram when his current supply was exhausted.

130.    In August 2014, Plaintiff was administered the following medications: HCTZ, Klor-con, Lisinopril, Triamcinolone cream, Metformin, Tramadol (Ultram), Xopenex, albuterol inhaler, albuterol breathing treatments, aspirin, and T-Gel shampoo.

131.    On September 4, 2014, Plaintiff submitted a Sick Call Slip, stating, "Crapping again, Headaches, Light Head, dizziness getting worst, even when I try taking, also rash has my sinuses on fire (Ask Diane & a Benadryl today) told to fill out this." Nurse Reeves responded on September 6, 2014, that she would refer Plaintiff to the doctor.

132.    On September 10, 2014, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of low blood sugars. Dr. McWhorter issued orders for blood sugar checks twice per day for one week.

133.    On September 17, 2014, Plaintiff submitted a Sick Call Slip, stating, "The prosthesis has started leaking, worked with it several times in last few days." [Williams] responded that [she] would order a (replacement) prosthesis.

134.   On September 19, 2014, Dr. McWhorter issued medical orders for Chlor-Trimeton, one tablet twice per day for seven days.

135.   On October 3, 2014, Plaintiff submitted a Sick Call Slip, stating, "Knot on back of head w 1 above & 1 below it very sore (infection looking coming out) Left hand fluid on thumb seems broke! Toes, bot of feet burning stinging." Nurse Reeves responded by referring to the Clinical Pathway Form she completed on October 5, 2014.

136.   On October 5, 2015, Nurse Reeves completed a Clinical Pathway Form for Plaintiff's complaints of pain in his left thumb. Plaintiff informed her that he had slipped on the floor after it had been mopped. Nurse Reeves observed no swelling or bruising, and no deformity. She noted that Plaintiff was guarding and holding his thumb. His peripheral pulses were good, and his skin was warm and dry. Pursuant to medical orders, she provided him with ibuprofen, 800 mg twice per day for five days. She instructed him to alert Medical if the condition changed.

137.   On October 7, 2014, Plaintiff complained to me that "I think I'm having a reaction to something." He requested Benadryl. [Williams] noted that Plaintiff's nose was red, but he was not having difficulty breathing. [She] provided Plaintiff a dose of Benadryl, and advised him to sign up for sick call.

138.   On October 12, 2014, Plaintiff submitted a Sick Call Slip, stating "Knot on neck (spine to right side) rash? Headaches (Lightheaded) Broke (R dislocated thumb)." Nurse Reeves responded on October 13, 2014, that she would set up an x-ray and put Plaintiff on the list to be seen by the doctor on October 15, 2014.

139.   On October 12, 2014, Dr. McWhorter issued medical orders for Plaintiff to be administered the influenza vaccine.

140.   On October 13, 2014, Plaintiff was administered an influenza vaccination. On October 13, 2014, Dr. McWhorter issued medical orders for an x-ray of Plaintiff's left finger.

141.   On October 14, 2014, the radiologist reported that the x-ray of Plaintiff's hand showed no fractures or dislocations, and no acute disease. On October 15, 2014, [Williams] noted that Plaintiff's blood sugar was 461 mg/dl. [She] checked his urine for ketones and glucose, and it was negative. [Williams] placed him on the list to be seen by Dr. McWhorter

that day.

142.   On October 15, 2014, Dr. McWhorter saw Plaintiff in the Jail medical office. Plaintiff complained of allergies and headaches. Dr. McWhorter diagnosed Plaintiff with an allergic reaction, and issued medical orders for Benadryl 25 mg per day, as needed.

143.   On October 21, 2014, the testing laboratory at Andalusia Hospital reported that Plaintiff's Hemoglobin A1C level (tested to monitor Plaintiff's average blood sugar levels) was 6.3, which according to the laboratory report, was within normal range for a patient with diabetes.

144.   On October 22, 2014, Plaintiff submitted a Sick Call Slip, stating, "Have heart enzymes ck'd & Hep C level heart valve links (Dr Butler found this) These haven't been ck'd since been here Knot on neck/Headaches." I responded that Plaintiff had been seen by the doctor for this issue the previous week, and did not want to see Plaintiff that day.
145.   On October 22, 2014, Dr. McWhorter noted that he had seen Plaintiff the previous week for a knot on his neck, and that he had checked it. He also noted that he would have Plaintiff's Hepatitis C enzyme level checked if Plaintiff went to a hospital.

146.   On October 23, 2014, Nurse Reeves ordered Plaintiff a replacement voice prosthesis.

147.   On October 26, 2014, [Williams] completed a Clinical Pathway Form for complaints of itching and burning to Plaintiff's face. [She] observed that Plaintiff's skin was dry, with no rash. Pursuant to medical orders, [Williams] discontinued Benadryl and provided Plaintiff with Claritin, 10 mg, one tablet per day for thirty days.

148.   On October 27, 2014, Plaintiff submitted a Sick Call Slip, stating "sinuses on fire, irritated – something needs to be done about this rash? (not getting better) prosthesis needed, throat overly irritated due to stretcher." [Williams] responded that a prosthesis had been ordered on October 25, 2014, and would arrive on October 27, 2014. [She] also noted that Plaintiff had been seen by Dr. McWhorter on October 15, 2014 for the rash, and that at Plaintiff's request, he had been ordered Benadryl 25 mg per day as needed. [Williams] added that Plaintiff had only asked for Benadryl twice since the medication had been ordered.

149.   On October 26, 2014, Dr. McWhorter issued medical orders for

discontinuation of Benadryl, and ordered Claritin 10 mg, once per day for thirty days.

150. On October 30, 2014, Plaintiff submitted a Sick Call Slip, stating "Spasm's in hand (left) & calves of legs reminder 4 Jennifer to get potassium tablets." Nurse Reeves responded that she would talk to the doctor on Wednesday. She later noted that a potassium level would be drawn on November 5, 2014.

151. In October 2014, Plaintiff was administered the following medications: HCTZ, Lisinopril, Metformin, Xopenex, aspirin, albuterol breathing treatments, albuterol inhaler, T-Gel shampoo, ibuprofen, flu vaccine, Benadryl, and Claritin.

152. On November 5, 2014, Dr. McWhorter issued medical orders for Plaintiff's potassium level to be checked.

153. In November, 2014, Plaintiff was administered the following medications: T-Gel shampoo, Benadryl, Claritin, HCTZ, Lisinopril, Metformin, Xopenex, Aspirin, albuterol breathing treatments, and albuterol inhaler.

154. On December 1, 2014, Plaintiff submitted a Sick Call Slip, stating "Prosthesis is leaking bad, tried cleaning, valve is curled, (no good) last 2 days bad migraines." I responded on the same day, noting that I had Plaintiff brought up for a prosthesis change, and had provided him with one dose of Tylenol.

155. On December 6, 2014, Plaintiff submitted a Sick Call Slip, stating "massive migraine last 3 days, w light headness, sweats, bld sugar 313 ck by Jessie, also blurness as they got worse, then cold clamy afterwards." Nurse Reeves responded on December 9, 2014, that Plaintiff had been seen in the Jail medical office. She referred to the Clinical Pathway Form she had prepared on that date.

156. On December 9, 2014, Nurse Reeves saw Plaintiff in the Jail medical office, for complaints of migraine headaches. She noted that Plaintiff had been provided with Tylenol and ibuprofen in the past, and that a CT scan had been negative. She observed that Plaintiff was alert and oriented, his gait and station were steady, his pupils were equal and reactive, and he exhibited no weakness of photophobia. She provided Plaintiff with one dose of ibuprofen, 800 mg, and advised him to alert medical if the condition changed.

157.   On December 9, 2014, Nurse Reeves ordered Plaintiff some replacement voice prosthesis.

158.   On December 9, 2014, Plaintiff submitted a Sick Call Slip, stating, "Place me back on diabetic trays, start cking sugar twice a day, & place me back on insulin as per my Dr." [Williams] responded on December 10, 2014, that Plaintiff had been referred to the doctor. [She] also noted that it was time for Plaintiff to be seen in chronic care.

159.   On December 10, 2014, Dr. McWhorter saw Plaintiff in the Jail medical office for chronic care clinic. Plaintiff complained of sinus congestion and blood sugars in the 100's. Dr. McWhorter issued medical orders for Cipro 500 mg, one tablet twice per day for ten days, Claritin 10 mg, on per day for ten days, a diabetic diet, and Topamax 25 mg per day. He also ordered that Plaintiff be administered no insulin.

160.   On December 16, 2014, Plaintiff submitted a Sick Call Slip, complaining of "Rash, all down my front chest, neck, been up most of night w/ burning itching, sneezing of the sinuses." [Williams] responded on December 17, 2014, that [she] had seen Plaintiff in the medical office, and had provided treatment according to treatment protocol and/or physician's orders.

161.   On December 17, 2014, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of itching, burning and redness to his skin. [She] observed red, dry patches on Plaintiff's skin. [Williams] advised Plaintiff to order lotion, to increase his fluid intake, and to avoid hot showers. [She] also provided him with hydrocortisone cream.

162.   On December 22, 2014, Plaintiff submitted a Sick Call Slip, stating, "Starting to notice while exercising, holding my head back or to right front/Light headness begins to [be] an issue, also headaches & certain positions, chest tightness." [Williams] responded on December 25, 2014, noting that Plaintiff had been seen in the Jail medical office. [She] referred to the Clinical Pathway Form and advised Plaintiff to alert medical staff if the problem persisted.

163.   On December 25, 2014, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of headaches and sore gums. He informed [the nurse] that he had obtained some Oragel, which helped. [Williams] advised him to get salt from the Jail kitchen for salt water gargles.

164.    On December 26, 2014, Plaintiff submitted a Sick Call Slip, stating, "Sores in mouth, nose, chest, whatever this rash is, is worst, sinuses on fire, rash feels like fire, not itch, headache from hell." Nurse Reeves responded on December 28, 2014, noting that Plaintiff had been referred to Dr. McWhorter for evaluation and treatment.

165.    On December 31, 2014, Plaintiff was seen by Dr. McWhorter in the Jail medical office. He complained of sinusitis and a rash from scrubbing the walls with bleach. Dr. McWhorter diagnosed Plaintiff with sinusitis and dermatitis, and entered medical orders for Triamcinolone cream twice per day for fourteen days. He also ordered discontinuation of Plaintiff's Metformin, and ordered Deep Sea Nasal Spray, twice per day for fourteen days.

166.    In December 2014, Plaintiff was administered the following medications: HCTZ, Lisinopril, Metformin, Xopenex inhaler, Aspirin, Albuterol breathing treatments, T-Gel shampoo, Ciprofloxacin, Claritin, and Topamax.

167.    In 2015, Plaintiff was seen regularly in the Chronic Care Clinic. At each chronic care visits, the medical staff would check his blood pressure, temperature, pulse, respirations, weight, and oxygen saturations. They reviewed his medications and diet, and noted whether there were any issues regarding condition control for diabetes, high blood pressure, and history of cancer.

168.    On January 21, 2015, Plaintiff submitted a Sick Call Slip, stating "Brake out w/ hives, welps, bad, ask for Benadryl for last 2 days, & med out of my cell 07, this morning bad light headed need BP ck'd & sugar."

169.    On January 23, 2015, [Williams] saw Plaintiff in the Jail medical office. I completed a Clinical Pathway Form for dizziness. [She] noted that Plaintiff complained of sudden dizziness. Plaintiff indicated no head injury, and no seizure history, and had no recent infections. He stated, "I think either my BP is too high or sugar is too low." [Williams] inquired as to whether Plaintiff had experienced any recent behavior changes or emotional events. Plaintiff responded that he had been placed in C-block for having a cell phone charger in his cell. [Williams] noted that Plaintiff's blood pressure was 136/80, his pulse was 84, respirations were 18, temperature was 97.6, oxygen saturation was 98%, and his blood sugar level was 110. [She] observed that Plaintiff was oriented, alert, calm, and cooperative, with no diminished recall. His gait and station were steady, with no signs of dizziness, no

vomiting, weakness, or photophobia. His pupils were equal and reactive to light, and his extra ocular muscles were intact. His respirations were non-labored. Pursuant to medical orders, [Williams] provided Plaintiff with one dose of Benadryl 25 mg.

170. On January 27, 2015, Plaintiff submitted a Sick Call Slip, stating, "Rash acts like scabbies [*sic*], sinuses draining, burning, sneezing, feet freezing sent a sick call on 1-25-15." [Williams] referred Plaintiff to Dr. McWhorter for further evaluation and treatment.

171. On January 28, 2015, Dr. McWhorter saw Plaintiff in the Jail medical office. He noted that Plaintiff complained of itching to his arm. Dr. McWhorter observed scratch marks on Plaintiff's left upper arm. He observed no signs of scabies, and ordered no treatment.

172. On January 29, 2015, Plaintiff submitted a Sick Call Slip, stating, "Requesting ENT, someone w/ full knowledge of inflamed sinuses w/ cancer ref (where my cancer start was found) lightheadedness & headache possibly associated w/ it." This document was forwarded to the Jail administrator, Preston Hughes on February 3, 2015, from Plaintiff's attorney, along with a letter stating, "Please find enclosed an Inmate Request Form completed by our client, Shelton Foster. We request your attention to the matters contained in the form and ask that you address Mr. Foster's complaint/problem." Jail personnel forwarded the documents to the medical office.

173. In January 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, Topamax, Metformin, Xopenex inhaler, Aspirin, Albuterol inhaler, T-Gel shampoo, Deep Sea nasal spray, and Triamcinolone cream.

174. On February 6, 2015, Plaintiff came to door of his cell, requesting Q-tips and tape for his prosthesis. [Williams] advised him to stop using medical tape to tape up mail and papers onto his cell wall. Plaintiff became angry stating "Well if I swallow this it's on y'all."

175. On February 9, 2015, Plaintiff submitted a Sick Call Slip stating, "Prosthesis leaking, sinuses draining bad, sore nose/sinuses feels like on fire."

176. On February 11, 2015, [Williams] placed Plaintiff on the list to see Dr. McWhorter for a referral consult with an ENT (Ear, Nose and Throat specialist).

177.   On February 11, 2015, Dr. McWhorter issued medical orders referring Plaintiff to an ENT.

178.   On February 12, 2015, [Williams] spoke with several ENT's who refused to see inmates. [Williams] finally spoke with Dr. Agro's office, to see whether Dr. Love (an ENT) would see him.

179.   On February 16, 2015, Plaintiff submitted a Sick Call Slip stating, "Coughing up blood now 5 days, left ear draining again, sinuses inflamed, headache from hell."

180.   On February 18, 2015, [Williams] arranged with Dr. Agro's office for an ENT appointment for Plaintiff for March 11, 2015. The office instructed for Plaintiff to be brought to the back door for the appointment.

181.   On February 22, 2015, Plaintiff submitted a Sick Call Slip stating, "Coughing blood from airway now for 11 days now – this is 3rd Request to do something – Please – feel like hell!"

182.   On February 23, 2015, Plaintiff came to the door of his cell with a very small amount of blood on tissue paper. Nurse Reeves contacted Dr. McWhorter, who issued medical orders for Cipro 500 mg, one tablet by mouth twice per day for ten days.

183.   On February 24, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form for upper respiratory symptoms. Plaintiff complained of a productive cough, clear secretions with blood, and headache. He denied having an earache, sore throat, facial pain, neck pain, shortness of breath, sweats or drainage in his throat. [Williams] observed that Plaintiff's blood pressure was 132/82, his pulse was 65, his respirations were 18, his temperature was 97.2, and his skin was warm and dry. His respirations were unlabored, and his lung sounds were clear. [She] noted no redness to his throat, no swollen tonsils, no exudates, and no swollen or tender glands. [Williams also] noted that the doctor had been called on February 23, 2015, and had issued medical orders to Nurse Reeves.

184.   On February 28, 2015, Plaintiff submitted a Sick Call Slip, stating, "Hurting bad in my chest, coughing up blood worst this morning 1 sample kept & shown to c/o Jessie."

185.   During the month of February 2015, Plaintiff was administered the

following medications: Aspirin, Lisinopril, HCTZ, Ciprofloxacin, Topamax, Albuterol breathing treatments, and T-Gel shampoo.

186. On March 1, 2015, Plaintiff came to the cell door with a bloody tissue. [Williams] saw Plaintiff in the Jail medical office and [she] completed a Clinical Pathway Form for upper respiratory symptoms. [Williams] noted that Plaintiff complained of a productive cough, with no runny nose, nasal congestion or drainage. He also complained of brown secretions with blood. He denied having an earache, facial pain, headache, or neck pain. He described pressure in his chest from coughing. He denied shortness of breath or sweats. He acknowledged having drainage in his throat. [Williams] noted that his temperature was 97.6, his respirations were 18, his pulse was 76, and his blood pressure was 126/74. His skin was warm and dry, his respirations were non-labored, and his lungs were clear. He had no pain on palpation of his sinuses, no redness in his throat, no exudates, no swollen or tender glands. A cough could not be reproduced with deep breath. [Williams] referred Plaintiff to Dr. McWhorter for further evaluation. [She] advised Plaintiff to alert medical if his conditions worsened. [Williams] contacted Dr. McWhorter, who ordered a chest x-ray.

187. On March 2, 2015, a chest x-ray was performed on Plaintiff. The radiologist who reviewed the x-ray reported that it was normal.

188. Plaintiff was unable to attend his appointment with Dr. Agro on March 11, 2015, due to staffing problems. Nurse Reeves rescheduled the appointment for April 1, 2015.

189. On March 17, 2015, Plaintiff submitted a Sick Call Slip, stating "Sinuses running bad, burning, headache, sore throat (Flu?)."

190. Nurse Reeves saw the Plaintiff in the Jail medical office on March 17, 2015. She completed a Clinical Pathway Form for upper respiratory symptoms. She noted that Plaintiff complained of a runny nose, and drainage, with no nasal congestion. He reported a dry cough, not productive, with no secretions. He also reported an earache in his left ear, a sore throat, and a headache. He had no facial pain, neck pain, no shortness of breath, and sweats. Nurse Reeves observed that Plaintiff's blood pressure was 120/82, his pulse was 86, his respirations were 18, and his temperature was 98.1. His skin was warm and dry, his respirations were non-labored, and his lungs were clear. He had no reddened throat, no swollen tonsils, no exudates, and no swollen or tender glands. Coughing was reproduced with deep breath. Nurse Reeves obtained medical

44

orders for Chlor-Trimeton, one tablet by mouth twice per day for five days.

191.   On March 31, 2015, Dr. Agro's office called and rescheduled Plaintiff's appointment for April 15, 2015.

192.   In March 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, Topamax, Ciprofloxacin, Xopenex inhaler, Aspirin, T-Gel shampoo, and Chlor- Trimeton.

193.   On April 11, 2015, Plaintiff submitted a Sick Call Slip, stating "2nd request coughing blood again Diane stated ENT would be seen, ENT has nothing to do w/ coughing blood from lungs."

194.   On April 11, 2015, Plaintiff submitted an Inmate Request Form, stating, "Problem w/ medical not doing anything about coughing blood, went through this mess 28 days last time over a month ago – ENT has nothing to do with lungs."

195.   On April 12, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form for upper respiratory symptoms. [Williams] noted that Plaintiff complained of a productive cough, with no runny nose or drainage. He stated that he had clear secretions with blood, but no earache, sore throat, facial pain or neck pain. He also complained of a headache, but denied shortness of breath, sweats or throat drainage. His blood pressure was 140/98, his pulse was 70, his respirations were 18, and his temperature was 97.1. His skin was warm & dry, his respirations were non-labored, and his lung sounds were clear. He had no pain upon palpation of throat, no reddened throat, no swollen glands, no tender glands, and no exudates. [Williams] referred Plaintiff to the doctor for further treatment.

196.   On April 15, 2015, Plaintiff was transported to an appointment at Dr. Agro's office, where he was seen by Dr. Love, an ENT. The next day, [Williams] spoke to Dr. Love, who requested a CT scan of Plaintiff's neck and head, with and without contrast. [Williams] spoke with Dr. McWhorter, who issued a referral order for the CT scan. [She] contacted the hospital, and made Plaintiff an appointment for a CT scan for April 20, 2015. [Williams] also made Plaintiff a follow-up appointment with Dr. Love for April 29, 2015.

197.   On April 20, 2015, Plaintiff was transported to Andalusia Regional Hospital for a CT scan. The radiologist reported that the scan showed

a mass at the left parotid bed, and abnormal soft tissue in the left submandibular area with differential. The CT of Plaintiff's head showed cerebral atrophy, with no evidence of mass, acute infarction or hemorrhage.

198.   On April 23, 2015, Plaintiff submitted a Sick Call Slip stating, "Last few days headaches have been worst. Left eye is being limited w/ vision – blurred, left ear hurts. Possible eye drops & Tylenol for headaches. (Use wax removal Diane gav me)." [Williams] saw Plaintiff in the Jail medical office on April 24, 2015. [She] completed a Clinical Pathway Form for earache. [Williams] noted that Plaintiff complained of intermittent sharp pain in left ear for three days. His blood pressure was 138/86, his pulse was 76, respirations were 16, temperature was 97.4. Plaintiff was alert, oriented and cooperative. [She] obtained physician orders from Dr. McWhorter for Amoxil (an antibiotic), 500 mg, two tablets twice per day for ten days, and guafenisin (for congestion), 200 mg, one tablet twice per day for five days.

199.   On April 29, 2015, Plaintiff was transported to an appointment with Dr. Love. Dr. Love wrote a letter to Dr. McWhorter, stating that Plaintiff "has a long history of H&N malignancy and uses a TEP prosthesis in his stoma for speech. I do not see obvious evidence of recurrent neoplasia and do not see any mass effect today which would cause me to suggest biopsy. I am told his TEP Blom Singer prosthesis was changed at UAB in recent months and for now it appears not to be leaking saliva into his stoma. I do not see blood in the upper trachea on exam in the office. With patients who have a stoma, one can inspect (as we did on his initial visit with no visible disease noted) clearly down to the carina with a small flexible scope. Today after reviewing the scan, I have advised that repeating a course of antibiotics (Augmentin would be a reasonable choice) for the Bronchitis might be helpful. I acknowledged his new complaint of headache and visual change in the left eye and advised that Optometry or Opthamology Consultation would need to be considered. With the H&N exam showing no new active H&N process requiring surgical intervention or examination under anesthesia, I would recommend we see him, now 8 to 10 years after successful laryngectomy in Pensacola, roughly every 6 to 12 months for H&N Malignancy surveillance and to check the TEP device."

200.   On April 30, 2015, Plaintiff submitted a Sick Call Slip, stating, "Left sinus running heavy, burning, light headed, headache, left eye blinded, coughing phlems heavy eye (9 days) sinuses, headaches, [light] headed over 11 months."

201.   In April 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, Albuterol breathing treatments, aspirin, T-Gel shampoo, Amoxil, and guafenisen.

202.   On May 1, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form for upper respiratory symptoms. [Williams] noted that Plaintiff complained of runny nose, drainage, productive cough, clear secretions, headache, and pressure. Plaintiff reported to her that he had this problem before, and it was treated with sinus medications. [She also] noted that Plaintiff had been seen by an ENT on April 29, 2015. [Williams] referred Plaintiff to Dr. McWhorter for the vision problem to his left eye. [She] observed that his blood pressure was 160/86, his pulse was 76, his respirations were 18, and his temperature was 98.5. His skin was warm and dry, his respirations non-labored, and his lung sounds were clear. He had no pain on palpation of his sinuses, his throat was not reddened, and he had no exudates, swollen glands, or pain with neck movement. [Williams] referred him to the doctor, and noted that he was already on antibiotics. [Williams] advised Plaintiff to alert medical if there were any changes or improvement. [She] contacted Dr. McWhorter, who issued medical orders to increase Plaintiff's Lisinopril to 20 mg per day, and to check Plaintiff's blood pressure daily for seven days.

203.   Pursuant to Dr. McWhorter's orders, medical staff checked Plaintiff's blood pressure daily from May 1, 2015 through May 6, 2015, and on May 10, 2015.

204.   On May 13, 2015, Dr. McWhorter saw Plaintiff in the Jail medical office. Dr. McWhorter informed Plaintiff of the findings from his consultation with Dr. Love, and told Plaintiff there had been no evidence of malignancy. Dr. McWhorter diagnosed Plaintiff with chronic sinusitis.

205.   On May 14, 2015, Plaintiff submitted a Sick Call Slip, stating "2nd request this wk, about headaches light head[ed]ness, eye blindness, running burning sinuses, send one 5/11/15, ask numerous times for something for headache, for sinuses w/no response."

206.   On May 15, 2015, Plaintiff submitted a Sick Call Slip stating "requesting something for headaches, running burning sinuses the blindness in left eye and the coughing up of blood from my soma (airway & lungs) not attached to sinuses. This has been going on too

long. I have hard time explaining these problems. Also seems no one cares."

207.  On May 15, 2015, Plaintiff submitted an Inmate Request Form, stating, "I have a hard time speaking my mind or keep bugging for something for these headaches or what is causing them to be so bad they have caused blindness in my left eye, with the sinuses, your Dr. couldn't even look, diagnose what the problem is, now can't even get anything to stop the burning, running sinuses, the cold effervescent tablets don't work, makes them run worst, they seem to think the blood I have been coughing up for 4 months off & on is caused by my sinuses. The blood coming from my soma (airway lungs area) not attached to my sinuses."

208.  On May 15, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form, noting that Plaintiff was complaining of sinus problems (drainage). [Williams] observed that Plaintiff had a steady gait, his pupils were equal and reactive to light, he was oriented, and his skin was warm. His blood pressure was 122/86, his pulse was 76, his respirations were 16, his oxygen saturations was 98%, his weight was 182, and his temperature was 97.6. [She] referred Plaintiff to Dr. McWhorter for further evaluation.

209.  On May 17, 2015, Plaintiff submitted a Sick Call Slip, stating "Seems 1st & 3rd request means nothing – I have asked as I can for something for headaches & the sinuses running & burning & written in black & white I'm asked what I need done today by Diane, Jen M-W, Sa- Su nothing at all – the headaches have gotten to the point pressure in left eye, blindness, the consistent coughing, blood from airway & lungs, nothing to do with sinuses." [Williams] received and responded to the request on May 19, 2015. [She] noted that Plaintiff was on the list to be seen by the doctor on May 20, 2015.

210.  On May 20, 2015, Plaintiff was seen in the Jail medical office by Dr. McWhorter. Dr. McWhorter noted that Plaintiff complained of headaches and blindness in his left eye. Dr. McWhorter observed that Plaintiff had decreased vision in his left eye. He issued medical orders referring Plaintiff to Dr. Blackston, an optometrist.

211.  Plaintiff was seen the next day by Dr. Blackston, who diagnosed him with a detached retina, and recommended he be referred to Dr. Franklin, a Retina Specialist. The same day, Dr. McWhorter issued a referral, and Plaintiff was transported to Dr. Blackston's office. After the appointment, [Williams] spoke with Dr. Blackston's office, who told

me that Plaintiff had a retinal detachment, and needed a referral to Dr. Alan Franklin, an ophthalmologist, for repair. [She] spoke with Dr. McWhorter, and obtained orders for the referral. [Williams] made Plaintiff an appointment with Dr. Franklin for the next day.

212.   On May 22, 2015, Plaintiff was transported to an appointment with Dr. Franklin. Dr. Franklin diagnosed Plaintiff with a total retinal detachment in his left eye, and recommended surgery. He prescribed Tobradex eye drops, 1 drop to affected eye three times daily for ninety days.

213.   On May 28, 2015, Plaintiff submitted a Sick Call Slip, stating "New prosthesis leaking bad, sinuses running, headache from hell – diarrhea." I obtained medical orders from Dr. McWhorter for Dexamethasone 0.1% drops, one drop to the left eye three times per day for thirty days, and Tobramycin 0.3% drops, 1 drop to the left eye three times per day for thirty days.

214.   On May 30, 2015, Nurse Reeves saw Plaintiff in the Jail medical office, and completed a Clinical Pathway Form for diarrhea. She observed that his abdomen was soft, he was oriented, there were bowel sounds present, his skin turgor was good, and his skin was warm. Plaintiff's blood pressure was 128/80, his pulse was 86, his respirations were 18, his oxygen saturation was 96%, and his temperature was 97.6. She provided him with one dose of Bismatrol, 30 cc.

215.   In May 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, albuterol breathing treatments, Aspirin, T-Gel shampoo, Amoxil, Dexamethasone eye drops, and Tobramycin eye drops.

216.   On June 3, 2015, Nurse Reeves made arrangements for Plaintiff to undergo surgery by Dr. Franklin on June 11, 2015. She also obtained medical orders from Dr. McWhorter for Elavil, 50 mg, one tablet per day for thirty days (for headaches).

217.   On June 4, 2015, Plaintiff submitted an Inmate Request Form, requesting that some paperwork be notarized. He also stated, "Also need a Dr. that can distinguish fact that my sinuses aren't attached to lungs & bronchile tubes causing cough up of blood."

218.   On June 4, 2015, Plaintiff submitted a Sick Call Slip, stating "Jock itch, raw ass from diarrhea, headaches, burning & run[ning] sinuses, proper medical attention something for all the problems."

219.   On June 5, 2015, [Williams] saw Plaintiff in the Jail medical office, and [she] prepared a Clinical Pathway Form. [Williams] listed Plaintiff's complaints as "Multiple." [She] observed that Plaintiff's gait was steady, and he was alert. His abdomen was soft, and his bowel sounds were within normal limits. His skin was warm with normal turgor. His respirations were even and unlabored, and [she] noted capillary refill. [Williams also] noted that there were medical orders for Elavil for Plaintiff's headache. [She] also provided Plaintiff with Pepto Bismol, twice per day for three days, and antifungal cream for Plaintiff to use as directed.

220.   On June 11, 2015, Plaintiff underwent eye surgery to correct a detached retina in his left eye. He was prescribed Tobradex eye drops, four times per day for two weeks, and Dexamethasone 0.1% drops, one drop four times per day to the left eye. [Williams] had Plaintiff kept in the Jail holding cell overnight for medical observation.

221.   On June 12, 2015, Plaintiff was transported to Dr. Franklin's office for a follow- up appointment.

222.   On June 16, 2015, [Williams] noted that Plaintiff would remain in the holding cell for safety and medical reasons. [She] directed Jail staff to take him to the shower.

223.   On June 17, 2015, Plaintiff submitted a Sick Call Slip, stating, "Risen came up near base just above penis, still coughing blood bad today."

224.   On June 17, 2015, [Williams] saw Plaintiff in the Jail medical office, and [she] completed a Clinical Pathway Form. [Williams] noted that Plaintiff complained of a "Risen" on his groin. [She] observed a boil to Plaintiff's groin, with no drainage. It was tender and swollen. Per medical orders, [Williams] provided Plaintiff with Bactrim DS (an antibiotic), one tablet twice per day for ten days.

225.   On June 19, 2015, Plaintiff requested to go back to D-pod. He stated, "I can leave my drops in the pod. I know how to do them. I can get on the pod button when it's time and come out and do them myself. I'm going crazy up here." I obtained permission from Dr. McWhorter to have Plaintiff returned to D-pod .

226.   In June 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, Albuterol breathing treatments, Aspirin, T-Gel shampoo, Dexamethasone eye drops, Tobramycin eye drops, Elavil,

Pepto Bismol and Bactrim.

227. On July 8, 2015, Plaintiff submitted a Sick Call Slip, stating, "Coughing up blood bad 7/7/15, bad headache, eye throbing real bad – told c/o & Jennifer (7-7-15) Lightheaded last 3-4 days when I stand up."

228. [Williams] saw Plaintiff in the Jail medical office on July 9, 2015, for his complaints. [She] completed a Clinical Pathway Form. [Williams] noted redness to the sclera of Plaintiff's right eye. He had no fever. His lungs were clear, with no wheezing and with clear tympanic membranes. [She] offered to refer Plaintiff to the Jail doctor, but Plaintiff refused. [Williams] noted that [she] would notify Dr. Franklin of Plaintiff's complaints. His blood pressure was 120/80, his pulse was 100, respirations were 18, oxygen saturations was 99%, and his weight was 183 pounds.

229. On July 10, 2015, Plaintiff was transported to and from Dr. Blackston's office for an appointment.

230. On July 10, 2015, Dr. McWhorter issued medical orders for Acular Opthal Sol 0.4% (anti-inflammatory), one drop to the left eye three times per day for two weeks.

231. On July 13, 2015, Plaintiff submitted a Sick Call Slip, stating, "Collapse this night approx. 9 pm – light headed so bad – everything went bad upon stressed out over Bible studies not given, being thrown in trash 6/4/15. Need heart related stress test done was suppose had done Sept 20 when arrested was scheduled & have requested since here."

232. On July 14, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form. [Williams] noted that Plaintiff was complaining of dizziness and fainting spells. His blood pressure was 118/80, his pulse was 85, respirations were 16, oxygen saturations was 98%, and his temperature was 97.6. Plaintiff stated, "I got stressed out because I'm not getting my bible studies. They throwing them in the trash." [Williams] referred Plaintiff to be seen by Dr. McWhorter. [She] noted: "I/M stated on sick call form that he was supposed to go for a stress test in September 2012 prior to being arrested. States 'My wife reminded me of it. When I told her what happened last night."

233. On July 15, 2015, at 8:00 a.m., Nurse Reeves asked Corrections Officer "Eddie" whether he had found Plaintiff passed out in his cell on July 13, 2015. The corrections officer informed Nurse Reeves "No, he was sitting up and stated he just didn't feel well." I reported to Nurse Reeves

that all of Plaintiff's vital signs had been within normal limits and that no signs or symptoms of distress were noted. Nurse Reeves relayed the incident to Dr. McWhorter. Pursuant to orders from Dr. McWhorter, Nurse Reeves arranged for Plaintiff to undergo an EKG (electrocardiogram) test.

234.   An EKG was performed on Plaintiff on July 16, 2015, and the results were faxed to Dr. McWhorter, who informed [Williams] that the EKG results were normal. In light of the normal EKG, Dr. McWhorter determined that no further cardiac testing was necessary at that time.

235.   Plaintiff signed his initial Complaint in this case on July 20, 2015.

236.   On July 20, 2015, Plaintiff submitted a Sick Call Slip, complaining of "lightheadedness, headaches, requested stress test (nothing as of this date) EKG doesn't show same results. (Phone call made by wife to cardiologist) also requesting Blood work for Hep C level, heart enzymes, full (bld) culture."

237.   Plaintiff was seen in the Jail medical office on July 22, 2015, by Dr. McWhorter, who noted, "Reviewed lab work & EKG. No need to explore cause for light headedness. Will not do stress test for him in light of normal EKG."

238.   On July 24, 2015, Plaintiff was transported to the ophthalmologist for a follow-up appointment. He was prescribed Pred Forte 1% (anti-inflammatory), 1 drop in the left eye three times per day.

239.   On July 26, 2015, Plaintiff submitted a Sick Call Slip, stating, "3rd request recently to have a stress test done to seek why I'm so light headed, w/ headaches – still coughing blood (sent sample w/ letter to med examiners Bd this day."

240.   On July 28, 2015, Plaintiff was seen in the Jail medical office. [Williams] explained to him that his EKG had been reviewed by a doctor, and was normal, and that Dr. McWhorter had not ordered any further testing. [She] explained to Plaintiff that if his condition changed, he should notify medical.

241.   On July 30, 2015, Plaintiff underwent a second surgery by Dr. Franklin to his left eye.

242.   On July 31, 2015, Plaintiff was taken to the ophthalmologist (Dr.

Blackston) for a follow-up appointment. Dr. Blackston recommended that Plaintiff discontinue Tobramycin and Dexamethasone, and to start Maxitrol ophthalmic ointment (antimicrobial and anti-inflammatory) three times per day through the weekend, then four times per day starting on Monday. Dr. Blackston diagnosed Plaintiff with a corneal abrasion from the surgery. He prescribed ibuprofen (for pain). Dr. McWhorter issued medical orders consistent with Dr. Blackston's recommendations.

243.    In July 2015, Plaintiff was administered the following medications: Amitriptyline, Dexamethasone, HCTZ, Lisinopril, tobramycin, Xopenex, Bactrim, Aspirin, and Albuterol breathing treatments.

244.    On August 1, 2015, Plaintiff submitted a Sick Call Slip stating, "If I can't get Ibuprofen or Tylenol in place of Norco 1 x 4 hr, fill the scrip & put me back up front throbbing in eye & sinuses running like a river from it."

245.    On August 1, 2015, [Williams] saw Plaintiff in the Jail medical office. Plaintiff informed me that he had been in pain all night. He requested that [she] provide him with Norco for pain. [Williams] had him moved to a holding cell for medical observation (because he was taking narcotic medication), and obtained medical orders from Dr. McWhorter for Norco (for pain) 7.5 mg three times daily. He was provided with Norco on August 1st and 2nd, 2015.

246.    On August 3, 2015, Plaintiff refused his medication that morning, stating, "I don't want any more Norco. I'm ready to go back to the back." Pursuant to medical orders from Dr. McWhorter, Plaintiff's Norco was discontinued, and ibuprofen was substituted for pain.

247.    On August 6, 2015, Plaintiff was taken for a follow-up appointment with Dr. Blackston. After the appointment, [Williams] spoke with Dr. Blackston, who informed me that Plaintiff's eye was healing, and that Plaintiff could use "artificial tears" as needed.

248.    On August 20, 2015, Plaintiff submitted a Sick Call Slip stating, "Coughing Blood Bad 3 days now, showed Jennifer yesterday, hurting in right lower lung area, had bad headache 2 days."

249.    On August 22, 2015, Nurse Reeves saw Plaintiff in the Jail medical office. She completed a Clinical Pathway Form. She noted that Plaintiff complained of coughing up blood. Nurse Reeves noted, "I/M showed this

nurse 3 days ago a sputum with a spot of red stuff unsure if it was blood. CBC has been done with normal results." She obtained medical orders from Dr. McWhorter to discontinue Plaintiff's ASA (aspirin).

250.    On August 28, 2015, Plaintiff was transported to an appointment with Dr. Franklin. After Plaintiff was returned from the appointment, [Williams] spoke to Dr. Franklin, who issued medical orders for acyclovir (an antiviral medication), 400 mg, one tablet by mouth twice per day for fourteen days, as well as Maxitrol eye drops.

251.    On August 28, 2015, Plaintiff submitted a Sick Call Slip, stating, "Sinuses inflamed, need something done so eye will heal properly (whatever causing sinituse as ya'll call it) Now have viral infection in eye (cause?) Headache from hell." [Williams] noted that Plaintiff had been started on antibiotic therapy by Dr. Franklin.

252.    In August 2015, Plaintiff was administered the following medications: dexamethasone, HCTZ, Lisinopril, Tobramycin, Xopenex, aspirin, albuterol breathing treatments, T-Gel shampoo, Maxitrol ointment, Maxitrol eye drops, ibuprofen, Chlor-Trimeton, Norco, and Acyclovir.

253.    Dr. McWhorter, the Jail medical director, died on August 31, 2015.

254.    From August 31, 2015, until October 7, 2015, Dr. Jason Junkins was the Jail Medical Director. From October 7, 2015 to the present, Dr. Pamela Barber has been the Jail Medical Director.

255.    On September 1, 2015, Plaintiff submitted a Sick Call Slip stating, "Welps around by rear & under my sack. I been fighting with now over 3 weeks that won't go away/ also sent a sick call Friday in reference to sinuses inflamed, headache from hell – reference hurting condition of heating in eye – placed on antibiotics due to it."

256.    On September 2, 2015, Nurse Reeves saw Plaintiff in the Jail medical office. She completed a Clinical Pathway Form. Nurse Reeves noted that Plaintiff complained of "welps" on his bottom. She noted no medical findings other than dry skin. She advised Plaintiff to have his wife bring some Vaseline for the dry skin problem.

257.    On September 5, 2015, Plaintiff submitted a Sick Call Slip, stating, "Need roll of tape clear 1" wide 3M my wife brought up here, also area around REAR END is burning itching worst this morning, out of eye drops."

54

258.   Plaintiff was seen in sick call on September 6, 2015 by Nurse Reeves. Plaintiff complained of dry skin on his bottom. Nurse Reeves informed Plaintiff that the doctor had recommended Vaseline as a treatment, and suggested that Plaintiff have his wife bring him some to the Jail.

259.   On September 10, 2015, Plaintiff submitted a Sick Call Slip, stating "Need gd tape, to be seen by a qualified Dr. for whelps on ass, burns, itches, coughing up blood headaches."

260.   On September 11, 2016, a Jail correctional officer reported to me that Plaintiff had complained that this blood pressure was high. Plaintiff was seen in sick call that morning by me. [Williams] checked his blood pressure, which was 170/106. [She] checked it again a few hours later, and it had decreased to 150/97.

261.   On September 11, 2015, [Williams] completed a Clinical Pathway Form for rash. [She] noted that Plaintiff complained of a rash to his buttocks. [Williams] examined Plaintiff's buttocks and observed no whelps or rash. [She] noted that Plaintiff would be completing his antibiotics that evening, and that he would be seen by the doctor for chronic care. His blood pressure was 150/92, his pulse was 74, respirations were 18, oxygen saturation was 99%, his weight was 181, and his temperature was 97.6.

262.   On September 13, 2015, [Williams] conducted a yearly medical assessment on Plaintiff. [She] checked his vital signs, and conducted a complete review of systems. [Williams] noted that Plaintiff's skin was dry with no rashes, his sclera was red and he wore reading glasses. [She also] noted that he had undergone two recent retinal detachment repairs. Plaintiff complained of sinus drainage. His appearance was appropriate, he was alert and oriented, and expressed no suicidal thoughts.

263.   On September 21, 2015, Plaintiff submitted a Sick Call Slip, stating "Rash on my ass & under my nuts, burns, itches, coughing blood, (samples kept) headaches, want to see a outside of SHP (a doctor for conditions) Left ear has sore & blood on it."

264.   On September 24, 2015, Nurse Reeves saw Plaintiff in the Jail medical office. She completed a Clinical Pathway Form. She noted that Plaintiff complained of a rash on his bottom. Nurse Reeves noted slight redness, but no rash on Plaintiff's bottom. Pursuant to medical orders from Dr.

Junkins, she provided Plaintiff with antifungal cream to apply daily until the rash was resolved.

265.    In September 2015, Plaintiff was administered the following medications: HCTZ, Lisinopril, Maxitrol eye drops, Pred Forte eye drops, Triamcinolone, Xopenex, Albuterol breathing treatments, T-Gel shampoo, and Acyclovir.

266.    On October 1, 2015, Plaintiff was seen for a chronic care visit by Dr. Junkins. Plaintiff's blood pressure was 120/82, his heart rate was 66, his temperature was 98.1, and his oxygen saturation was 99%. Dr. Junkins noted a few scattered expiratory rhonchi in Plaintiff's lungs, and ordered a chest CT (x-ray computed tomography, or CAT scan). [Williams] scheduled the CT scan for October 7, 2015.

267.    On October 4, 2015, Plaintiff submitted a Sick Call Slip, stating "Rash on my rear end & under my nuts. Welps feels like its on fire, burns, antifungal salve (not working) headache from hell, w/ light headaches (over months)."

268.    On October 6, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form. [Williams] noted that Plaintiff complained of a rash in his genital area. [She] noted that [her] observations did not correspond with Plaintiff's report, because [she] did not observe a rash. [Williams] also noted that Plaintiff had been seen by Dr. Junkins and had been given hydrocortisone for itch. [Williams] referred Plaintiff to be seen by the Jail doctor. Plaintiff's blood pressure was 136/84, his pulse was 76, his respirations were 18, and his weight was 180.

269.    On October 7, 2015, a CT scan of Plaintiff's chest was performed. The radiologist reported that compared to a CT of May 22, 2015, he observed some new patchy infiltrate, but no suspicious nodules or infiltrates elsewhere. Dr. Barber reviewed the report, and noted: "Spoke with Dr. Junkins repeat CT in 3 months."

270.    On October 7, 2015, Plaintiff submitted a Sick Call Slip stating, "Knot on jugular vein of neck left side (swollen), headache from hell, (lightheaded) was held in holding last night uncalled for, CT today dehydrated bad, 10x stuck to get bld. Refused something for headache at night & am."

271.    On October 8, 2015, Nurse Reeves saw Plaintiff in the Jail medical office. She completed a Clinical Pathway Form. Nurse Reeves noted that

Plaintiff complained of a rash on his chest and neck. She observed that Plaintiff's skin was dry. She observed redness and discoloration, and pursuant to orders from Dr. Barber, provided Plaintiff with Benadryl 25 mg, one tablet twice per day for five days.

272.   On October 9, 2015, Plaintiff submitted a Sick Call Slip, stating "Place on elbow trying to get infected, still being lightheaded w/ headache, vein in neck bulging."

273.   On October 10, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form. [She] noted that Plaintiff complained of an abrasion to his left elbow. He reported broken skin and tenderness. [Williams] checked Plaintiff's vital signs. [She] observed that his skin had some redness, and was warm, and observed a 1 1/2 inch abrasion, with no drainage or streaking.

274.   From October 10, 2015, to October 13, 2015, Plaintiff was placed on a wound care protocol for a wound to his left elbow. The wound was examined and treated daily, and the nurses entered medical notes on a Medical Wound Flow Sheet documenting the size, appearance and condition of the wound. The wound was completely healed by October 13, 2015.

275.   On October 19, 2015, Plaintiff submitted a Sick Call Slip, stating, "bulging vein in left neck, headaches (dizziness) over a yr, rash (month) (cones & goes w/ welps) HepC (bldwork) since 10/12, ears hurting few days (right left was fluid) results from CT why coughing bld over hr requested to C Dr. on above date."

276.   On October 20, 2015, Plaintiff submitted a Sick Call Slip, stating, "Awoke spasm in leg calfs bad, & left hand, headache from hell, hurting in right side (felt like spasm) C request from 10/16/15, 10/18/15 comparison ear still bother me." [Williams] referred Plaintiff to the doctor for further evaluation and treatment.

277.   On October 23, 2015, Plaintiff submitted a Sick Call Slip, stating "Now due to not treating the allergic reaction have 2 places @ some & 1 on pelvic area infected still itching seriously. Sent Judge request (copy made)."

278.   On October 23, 2014, [Williams] obtained medical orders from Dr. Junkins for Acyclovir, 400mg, one tablet twice per day by mouth for ten days.

279.  On October 24, 2015, [Williams] saw Plaintiff in the Jail medical office. [She] completed a Clinical Pathway Form. [Williams] noted that Plaintiff complained of a rash or boil around his stoma. [She] checked Plaintiff's vital signs. [Williams] observed that his skin was dry, with redness and swelling. [She] obtained medical orders for Bactrim DS (an antibiotic), one tablet by mouth twice per day for ten days.

280.  On October 26, 2015, Plaintiff submitted a Sick Call Slip, stating, "These 3 spots of infection needs a doctors ATTENTION, swelling, painful, worst the antibiotics Diane prescribed not working."

281.  On October 26, 2015, Plaintiff submitted an Inmate Request Form, stating, "I am requesting information to the whereabouts of my personal breathing equipment, & prescribed albuterol capsules. The nebulizer was special fitted for my neck w/ hole in it, the compressor, grey in color shape as a small football (name not remembered). I was told last wed to do a breathing treatment since my inhaler was out. Was told was ordered, was handed on a pill am before any express carrier delivered the refusal of a bendryl cause excessive inflammation neck, throat, which turned to staff - this will be my final plea before I take action also viral inf. in eye per Dr. Franklin." Nurse Reeves responded, "I/M requested for his wife to pick up machine 2 yrs ago which Mrs. Foster did. I/M hasn't had it in 2 yrs & hasn't had issue with using SHP's machine & hookup. I/M is being treated for inflammation on throat, no signs or symptoms of staff noted. I/M also was started on meds per eye MD for viral infection. This nurse notified MD Dr. Junkins on call & he gave no new orders at this time."

282.  On October 27, 2015, Nurse Reeves received a telephone call at 4:30 a.m. from a Jail corrections officer. The officer, Sgt. Scott, informed Nurse Reeves that Plaintiff was complaining of shortness of breath. Nurse Reeves requested that Sgt. Scott check Plaintiff's oxygen saturation and respiration rate. Sgt. Scott reported that Plaintiff's oxygen saturation was 99% and his respirations were 20. When Nurse Reeves arrived at the Jail for pill call, she watched Plaintiff through his cell door. Plaintiff appeared to be in no distress, and his respirations were even and unlabored. Nurse Reeves had Plaintiff moved to a holding cell for medical observation, and called his physician, Dr. Junkins. Dr. Junkins issued no medical orders. Nurse Reeves observed throughout the day that Plaintiff was laughing and talking, with no signs or symptoms of distress, no complaints of pain, no itching and no shortness of breath.

283. On October 27, 2015, Plaintiff submitted an Inmate Request Form, stating, "I need to speak to you face to face, also need a picture of this infected area on my neck next to my soma that busted last night allowing bld & pus into my airway while I was asleep, awoke gasping for air, coughing hugh masses of pus & bld from Bronicle & lungs." Jail staff wrote in response: "Nurse was called 4:30 a.m. re I/M c/o SOB asked Sgt Scott to check I/M O2 sat & resp. O2 99% & resp 20 also stated no distress noted."

284. On October 27, 2015, Nurse Reeves obtained medical orders from Dr. Junkins to check Plaintiff's blood sugar twice per day for five days.

285. On October 28, 2015, a corrections officer informed me that Plaintiff had reportedly been "in distress" all night. I contacted Plaintiff, who expressed no complaints. Plaintiff informed me that the PRN Nurse, "Becky", had checked his blood sugar the day before, and that it had been 315. I promptly contacted Nurse Becky, who stated that Plaintiff's blood sugar had actually been 131 mg/dl. Later that morning, Nurse Reeves reported the correct blood sugar reading to Plaintiff, who raised his voice and became very agitated. He stated, "Let me go back to the back, they ain't doing shit for me up here." He then accused medical of lying about his blood sugar. Nurse Reeves assured Plaintiff that they would continue to monitor his blood sugar.

286. On October 29, 2015, Plaintiff was transported to and from the hospital for an outpatient eye surgery by Dr. Franklin.

287. Plaintiff was seen in the Jail medical office on October 29, 2015, by Dr. Barber. Dr. Barber noted, "Pt was seen at sick call for FU skin rash and his anterior chest weal which is much improved. Will continue prn Triamcinolone cream and prn Benadryl."

288. On October 30, 2015, Plaintiff was transported to and from an appointment with Dr. Blackston. Later that day, he was brought to the medical office with a small superficial "nick" to his throat. He stated that he had received the cut while using clippers on his head. I applied antibiotic cream and a band aid to the wound. I also obtained medical orders from Dr. Barber for Acyclovir, 400 mg twice per day for ten days.

289. On October 30, 2015, Plaintiff refused a blood sugar check. He refused to give a reason, and refused to sign a Refusal of Medical Treatment form.

290. On October 31, 2015, Plaintiff refused his morning and evening

blood sugar checks. He refused to give a reason, and refused to sign the Refusal of Medical Treatment form.

291.  In October 2015, Plaintiff was provided the following medications: HCTZ, Lisinopril, Xopenex, Pred Forte, Albuterol breathing treatments, T-Gel shampoo, Hydrocortisone, Benadryl, Bactrim DS, Acyclovir, and Maxitrol.

292.  On November 1, 2015, Plaintiff was administered a flu vaccine, pursuant to medical orders from Dr. Barber.

293.  Plaintiff refused to have his blood sugar tested from October 30, 2015, through November 1, 2015. He refused to state a reason, and he refused to sign the Refusal of Medical Treatment form.

294.  On November 2, 2015, Plaintiff submitted a Sick Call Slip, stating, "Request for Bloodwork for HepC level, Potassium, Heart enzymes, A1C, why doc. Awaiting (3) month for coughing blood, now over 1 yr going spasm, craps in leg, hand, still refused to see my medical records. Headaches & dizziness. Also nothing done about bulging blood vessel in L Neck, over ... now." Nurse Reeves referred him to the Jail doctor for evaluation and treatment.

295.  On November 6, 2015, Dr. Barber saw Plaintiff in the Jail medical office. She noted, "Saw patient this morning for a multitude of complaints which are basically the same complaints as before. I did tell the pt that I would order the potassium lebe, Hgba1c and HepC viral load. Will review his x-rays."

296.  On November 16, 2015, Plaintiff submitted a Sick Call Slip, stating "wish to see doctor, lightheaded dizzy past few days (actual off & on to long) bulging vein in neck (main artery) over a month (since C/T by ENT done) wish to review medical records per 45 CPR 164.524 know results of blood work – coughing up blood over air – de Hydrated so bad at last C/T took 10 times to get vein – Anthesis had to do it. Blood pressure ck'd – in instrument I can see results." [Williams] referred Plaintiff to the Jail doctor for further evaluation.

297.  On November 17, 2015, [Williams] called the hospital to obtain the laboratory results of Plaintiff's blood tests. [She] was informed that the Hepatitis C test had not been performed.

298.  On November 18, 2015, Plaintiff was seen by Dr. Barber in the Jail

medical office. She noted that nothing had changed, and ordered that the medical staff should redraw Plaintiff's blood for a Hepatitis C test, and also ordered a CT scan of the neck in two months.

299.   On November 19, 2015, a specimen of Plaintiff's blood was collected and submitted to the laboratory for testing. On November 22, 2015, the laboratory at Andalusia Regional Hospital reported that Plaintiff's Hemoglobin A1C was 6.9. The laboratory reported that a test result of less than 7.0 is considered glycemic control. Plaintiff's potassium level was 4.4, which was reported as within normal range.

300.   On November 20, 2015, Plaintiff was transported to an appointment with Dr. Franklin. Dr. Barber issued medical orders for Plaintiff to complete his supply of Maxitrol drops.

301.   On November 24, 2015, Plaintiff complained to me at the morning pill call that his left eye felt like a hot needle was being pushed into it. [She] immediately arranged for transport, and Plaintiff was taken to Dr. Blackston's office for a consult. That afternoon, [Williams] spoke to Dr. Blackston, who issued orders for Plaintiff to continue using Maxitrol drops four times per day, and to use Genteal eye lubricant gel.

302.   In November 2015, Plaintiff was administered the following medications:  Acyclovir, flu vaccine, Maxitrol drops, and Pred Forte.

303.   On December 1, 2015, Plaintiff submitted a Sick Call Slip, stating, "Headaches light headness (stress test needed) blood test results lung specialists (follow up) get medical records (from Hosp) coughing up blood, bulging artery on left neck (not scar tissue)." I referred Plaintiff to be seen by Dr. Barber at her next Jail visit.

304.   Plaintiff was seen by Dr. Barber in the Jail medical office on December 3, 2015. According to Dr. Barber, Plaintiff had a "multitude of complaints." In addition to the usual complaints, he also complained of vertigo, blood tinged sputum and chronic sinus drying. Dr. Barber ordered Zyrtec (an antihistamine) for the sinus complaints, an EKG, and a CT of the chest, to be performed in January 2016. She noted that Plaintiff's blood pressure was up, and she ordered one dose of Clonidine 0.2 mg. She issued medical orders to monitor Plaintiff's blood pressure daily for five days.

305.   At 12:00, on December 3, 2015, I noted that Plaintiff's blood pressure was down to 148/98.

306.     On December 7, 2015, Plaintiff submitted a Sick Call Slip, stating, "Fighting w/ rash all weekend, coughing bld bad, lightheadness (like to know results to bld test) wife got aletter from gastrologist about continuing treatment for HepC." I referred Plaintiff to the doctor for evaluation and treatment.

307.     On December 11, 2015, Dr. Barber issued medical orders for Keflex (an antibiotic), 500mg, one tablet by mouth twice per day for ten days. She also ordered guaifenesin (for cough) 200mg by mouth twice per day for ten days.

308.     On December 14, 2015, Dr. Barber issued medical orders for Topamax 50 mg, one by mouth twice per day for thirty days. She also ordered laboratory blood testing.

309.     On January 5, 2016, the laboratory at Andalusia Regional Hospital submitted a report showing that Plaintiff's blood test results were within normal range, except for MPV and MCV, which were slightly elevated. Dr. Barber reviewed the report on January 6, 2016.

310.     On January 7, 2016, the radiologist, Dr. Donald Dahlene, reported his review of a CT scan of Plaintiff's chest. He noted that there was diffuse emphysematous change throughout both lungs, and areas of unchanged bronchiectasis in the right lower lobe. He also noted some pleural thickening in the right lower lobe, slightly better defined but roughly unchanged from October 7, 2015. Dr. Barber reviewed the report on January 13, 2016. Plaintiff was seen in the Chronic Care Clinic on January 13, 2016. His blood pressure, temperature, pulse, respirations and weight were checked. Dr. Barber reviewed his medications and diet, and made no changes to his medical treatment at that time.

311.     On January 19, 2016, Plaintiff submitted a sick call slip, stating, "Coughing bld hard (hurt chest) Hep C (Hurt Side & Back) Light headed what gonna get done about all this stress test burning when urinating slow." Medical received the slip on January 19, 2016, and referred Plaintiff to be seen by the doctor.

312.     On January 21, 2016, Plaintiff submitted a sick call slip, stating "Coughing bld very hard showed Nurse Diane at even pill call & aft showed STG Rick massive amounts enough bullshit wand lung specialists." Medical received the slip on January 22, 2016. Williams noted that the doctor had been notified, and she wrote, "See Progress

Note."

313.   On January 21, 2016, Plaintiff was seen in the Jail medical office by Dr. Barber. Plaintiff complained of coughing up blood and shortness of breath. He also requested treatment for Hepatitis C. Dr. Barber made no changes in Plaintiff's medical treatment at that time.

314.   On January 21, 2016, at the evening "pill call", Plaintiff approached the cell door and held up a paper towel inside a plastic bag, with spots of bright red blood. Later that evening, Plaintiff sent a sick call request form to medical that had spots of blood on it. [Williams] sent the sick call form back to Plaintiff, with instructions to fill out a new form. Plaintiff informed the Jail correctional officer that the next sick call form he filled out would be for his lawyer.

315.   On the morning of January 22, 2016, Plaintiff approached the cell door, and informed me that he was coughing up "massive" amounts of blood. The correctional officer informed that Plaintiff had shown him the same plastic bag he had shown the nurse the evening before.

316.   On January 22, 2016, I informed Dr. Barber that Plaintiff was still complaining of continuing to cough up blood. Dr. Barber ordered that a blood test be performed the following Monday. That evening, I was delivering medications at "pill call." Plaintiff approached the door of his cell, holding two plastic bags with paper towels in them. The paper towels appeared to contained blood-tinged sputum.

317.   On January 24, 2016, during the evening "pill call", Plaintiff showed Nurse Reeves a napkin with a dime-sized spot of blood and yellow phlegm. Nurse Reeves informed Plaintiff that Dr. Barber had issued medical orders for a blood test. She advised Plaintiff to drink plenty of fluids, and informed him that his blood would be drawn the next day.

318.   Plaintiff's blood was drawn on January 25, 2016. The laboratory report was reviewed by Dr. Barber on January 28, 2016.

319.   On January 28, 2016, Plaintiff was seen in the Jail medical office by Dr. Barber. Dr. Barber noted that Plaintiff was still complaining of hemoptysis. She noted that this was the fifth time he had been seen for this complaint. She referred him to be seen by Dr. Garver, a pulmonologist.

320.   On January 28, 2016, I made an appointment for Plaintiff with Dr.

Garver for February 5, 2016.

321.     During the month of January, 2016, pursuant to medical orders form the doctor, Plaintiff was provided with the following medications: HCTZ, Lisinopril, Xopenex inhaler, Topiramate, Albuterol inhaler, T-Gel shampoo, Genteal eye drops, and Zyrtec.

322.     On February 4, 2016, Plaintiff submitted a sick call slip stating, "Being refused bld pressure ck Tuesday when equip was on cart was lightheaded, pale, another incarcerated also inquired"(sic). This slip was received by Medical on February 5, 2016. [Williams] noted that Plaintiff had been seen in Chronic Care. [She] also noted that his temperature was 97.6, his respirations were 18, his pulse was 66, and his blood pressure was 100/72.

323.     Plaintiff was seen in the Chronic Care Clinic on February 5, 2016. His blood pressure, temperature, pulse, respirations and weight were checked. Dr. Barber reviewed his medications and diet, and made no changes to his medical treatment.

324.     On February 5, 2016, Plaintiff was transported to Dr. Garver's office for an appointment. Dr. Garver reviewed the chest CT scans from May 22, 2013, October 7, 2015, and January 7, 2016, and noted that Plaintiff had a slowly enlarging right lung lower lobe mass, which was likely malignant. He recommended that Plaintiff undergo a diagnostic bronchoscopy procedure.

325.     On February 9, 2016, Dr. Garver performed a bronchoscopy with transbronchial biopsy. The specimen was examined by Dr. Benjamin Harvard, a pathologist, who reported a diagnosis of invasive adenocarcinoma.

326.     Plaintiff was returned to the Jail on February 9, 2016, and was kept for observation in the holding cell overnight. The next morning, at his request, he was returned to his cell block in no distress.

327.     On February 14, 2016, Plaintiff submitted a sick call slip stating, "Where is the Zyrtec pill, what is small white pill? Sinuses running burning, congestion, coughing bldy phlegm bld pressure was low @ biopsy 99/62 102/69 107/72 monthly chronic" (sic).

328.     On February 15, 2016, Plaintiff was seen by Nurse Reeves in sick call for complaints of a sore throat, fever and breathing difficulty. The nurse

noted that he was coughing, but his respirations were even and unlabored. Pursuant to medical orders from Dr. Barber, Plaintiff was given Amoxil, 500 mg, two tablets twice per day for ten days, and ibuprofen, 800 mg twice per day for five days.

329.   On February 19, 2016, Plaintiff was transported to an appointment with Dr. Garver. Dr. Garver scheduled him for a followup appointment for March 3, 2016. He also scheduled a PET (Positron Emission Tomography) scan for February 26, 2016.

330.   On February 21, 2016, Dr. Barber issued medical orders for Plaintiff to be sent to the emergency room for evaluation and treatment of chest pain, dehydration and acute kidney injury. He was admitted for testing. On February 22, 2016, Nurse Reeves was informed by the hospital that all tests performed had come back negative. On February 24, 2016, Plaintiff was discharged from the hospital. He was returned to the Jail, and showed no signs of distress. At his request, he was returned to his cell block.

331.   On February 26, 2016, Dr. Barber issued medical orders for Ensure, one dose twice per day.

332.   On February 26, 2016, Plaintiff was transported to Andalusia Regional Hospital for a PET scan. Dr. Kenneth Richardson reviewed the PET scan, and reported an area of abnormal metabolic activity in the posterior right lung base consistent with neoplasm. He saw no indication of metastatic disease in the mediastinum or hilar regions, and some mildly metabolically active lymph nodes in the neck and submandibular spaces.

333.   In February 2016, pursuant to medical orders from the doctor, Plaintiff was provided with the following medications: HCTZ, Lisinopril, Xopenex inhaler, topiramate, albuterol inhaler, T-Gel shampoo, Zyrtec, amoxicillin, ibuprofen, prednisone, and Keflex.

334.   On March 3, 2016, Plaintiff was seen in followup by Dr. Garver, who recommended to stop Plaintiff's albuterol, and to start ipratropium bromide. He also recommended referral to Dr. Larkin Daniels for possible surgical removal of lung cancer.

335.   Plaintiff was seen in the Chronic Care Clinic on March 3, 2016. His blood pressure, temperature, pulse, respirations and weight were checked. Dr. Barber reviewed his medications and diet, and she issued medical

orders to discontinue Plaintiff's albuterol. She ordered Ipratropium bromide 0.02%/2.5 mL, four times per day as needed.

336.   On March 8, 2016, Plaintiff was seen in the Jail medical office by Dr. Barber. Plaintiff complained of a productive cough, hemoptysis, loose stools, feeling tired, and a sore throat. Dr. Barber issued medical orders for Azithromycin, 500 mg by mouth twice per day for five days, and Tessalon Perles, 100mg by mouth twice per day for five days.

337.   Dr. Garver referred Plaintiff to be seen in consultation by Dr. Larkin J. Daniels, a Thoracic and Cardiac surgeon in Mobile, Alabama, for a right lower lobe adenocarcinoma. On March 14, 2016, Plaintiff was transported to be seen in an office visit by Dr. Daniels. Plaintiff complained of weight loss, impaired vision, shortness of breath, cough, dyspnea on exertion, hemoptysis, diarrhea, dysphagia, and numbness and tingling. After conducting a physical examination, Dr. Daniels diagnosed a malignant neoplasm of the lower lobe of the right lung, and recommended a right lower lobe and mediastinal node dissection. He directed that Plaintiff should be referred to Cardiology Associates for cardiac screening prior to the surgery.

338.   On March 16, 2016, Dr. Barber referred Plaintiff to be seen by Dr. Price, a cardiologist, to obtain cardiac clearance for his upcoming lung dissection surgery. I made arrangements for Plaintiff to be seen by Dr. Price on March 29, 2016.

339.   On March 18, 2016, Plaintiff was transported to be seen by Dr. Franklin.

340.   On March 21, 2016, Plaintiff complained to Nurse Reeves of lung pain. He stated that he had been given Neurontin in the hospital, and it had helped. Nurse Reeves contacted Dr. Barber, who issued medical orders for Neurontin, 600 mg, twice per day.

341.   On March 21, 2016, Plaintiff submitted a Grievance Form stating, "There seems to B a problem w/ communications w/ cooks, w/o certified dietician in kitchen that know what is what about starches, sugars, etc., diabetics trays in full, feeding properly in respect to anyone health white bread turns to starch, which turns sugar, may not get someone that knows foods service (Rudy Jones) 14+ years or certified dietician (Dr.) & Nurses has told people in kitchen no starches, sugar keep sending I do / w/o"(sic). Medical received the form on March 22, 2016. [Williams] responded in writing, "This has been addressed with the kitchen. Medical has no control over who is put in the kitchen or on the

hall."

342.   On March 25, 2016, Plaintiff was provided with a replacement voice prosthesis.

343.   On March 29, 2016, Plaintiff was transported to the office of the cardiologist, Dr. Price for pre-operative cardiac clearance. Dr. Price recommended a Nuclear Stress test and an echocardiogram. When Plaintiff returned to the Jail, he complained to [Williams] of an upset stomach. [Williams] contacted Dr. Barber, who issued medical orders for Promathazine, one 25 mg dose by mouth.

344.   On March 29, 2016, Dr. Barber issued medical orders for a nuclear stress test and echocardiogram. [Williams] contacted Dr. Price's office and scheduled a Nuclear Stress Test and echocardiogram for March 30, 2016. I obtained instructions from Dr. Price's office on how to prepare Plaintiff for the tests.

345.   On March 30, 2016, Plaintiff was transported to Andalusia Regional Hospital, where the nuclear stress test and echocardiogram were performed. Dr. Price cleared Plaintiff for the recommended lung surgery as an "intermediate risk."

346.   On March 31, 2016, Dr. Barber saw Plaintiff in the Jail medical office. Dr. Barber issued medical orders for ibuprofen, 800 mg by mouth each evening for seven days.

347.   On the evening of March 31, 2016, [Williams] gave Plaintiff his evening dose of ibuprofen at pill call.  Plaintiff became irate, stating, "You were just supposed to hand me the ibuprofen so I can take it later." [Williams] explained to Plaintiff that it was against protocol to leave medications with patients. [She] informed Plaintiff that [she] would contact the doctor to clarify the medical order. Plaintiff then walked away from the cell door, cursing and stating, "I'm calling my lawyer about this."

348.   On the evening of March 31, 2016, I contacted Dr. Barber. Dr. Barber denied telling Plaintiff that he could keep his pill call medication for later. She informed me that if he wanted to keep the ibuprofen with him, he would have to order it through the commissary.

349.   Plaintiff was seen in the Chronic Care Clinic on April 2, 2016. His blood pressure, temperature, pulse, respirations and weight were checked. Dr. Barber reviewed his medications and diet, and made no changes to his

medical treatment. She ordered that Plaintiff be placed on a diabetic diet.

350.   During the month of March, 2016, pursuant to doctor's orders, Plaintiff was provided the following medications: Lisinopril, Xopenex, Topiramate, HCTZ, Albuterol, Zyrtec, Prednisone, Keflex, Ipratropium, Azithromycin, Tessalon Perles, Neurontin, Phenergan, Genteal eye drops, and Ibuprofen. He was provided a replacement voice prosthesis and T-Gel shampoo.

351.   On the morning of April 3, 2016, Nurse Reeves noted that Plaintiff continued to complain of pain in his lung. She contacted Dr. Barber, who informed her that Plaintiff would be started on Norco when Dr. Barber saw him on the upcoming Wednesday, but that Plaintiff would have to be kept in a holding cell while taking the medication. Nurse Reeves noted that she informed Plaintiff of the new orders, and he refused to start Norco or to stay in a holding cell. Nurse Reeves notified Dr. Barber of Plaintiff's response.

352.   On April 4, 2016, Nurse Reeves saw Plaintiff in sick call. He complained of right flank pain. Nurse Reeves contacted Dr. Barber, who issued new medical orders.

353.   On April 6, 2016, Dr. Barber issued medical orders to increase Plaintiff's Neurontin from 600 mg twice per day to 800 mg twice per day. She also ordered Aleve 600 mg per evening.

354.   On April 11, 2016, Plaintiff submitted a grievance form, explaining at length the reasons why he believed he should not be placed in a holding cell.

355.   On April 12, 2016, Dr. Barber issued medical orders for Lasix 20 mg twice per day, and she discontinued the HCTZ.

356.   On April 18, 2016, Dr. Barber saw Plaintiff in the Jail medical office. She noted that Plaintiff had lower left extremity edema and cellulitis. She issued medical orders for Keflex  500 mg by mouth, twice per day for seven days, and Lasix 20 mg by mouth, twice per day. She also ordered one dose of Clonidine, 0.1 mg by mouth.

357.   During the month of April, 2016, pursuant to medical orders issued by Dr. Barber, Plaintiff was provided the following medications: Ipratropium 0.02% via nebulizer, Lisinopril, Gabapentin, Topiramate, HCTZ, T-Gel shampoo, Zyrtec, ibuprofen, Neurontin, Aleve, Lasix, and Keflex.

358.   On April 21, 2016, Plaintiff was transported to Mobile Infirmary Medical Center, where he underwent a right lower lobectomy to remove an area of adenocarcinoma from his right lung. As per the Plaintiff's request, the non-functioning infusion port in his chest was also removed. While in the hospital, Plaintiff developed a DVT (deep venous thrombosis, or blood clot) in his left leg, which was treated in the hospital. He was discharged on May 20, 2016 and returned to the Jail.

359.   After Plaintiff was returned to the Jail on May 20, 2016, Dr. Barber issued medical orders for the following medications: Spiriva, 18 mcg inhaled, once per day; Metoprolol 25 mg, ½ tablet twice per day; Augmentin 875 mg, one tablet twice per day for ten days; Zyvox 600 mg twice per day for ten days; Lisinopril 5 mg once per day; and Norco 7.5 mg one every six hours as needed.

360.   Plaintiff's discharge instructions received from Mobile Infirmary Medical Center directed that follow-up appointments should be scheduled with Dr. Larkin Daniels and Dr. Peter Lutz for June 6, 2016.

361.   On the afternoon of May 20, 2016, Nurse Craft received a telephone call from Jerri Dairs, RN, at Mobile Infirmary Medical Center. Jerri Dairs informed Nurse Craft that the Jail needed to disregard the discharge orders to follow up with Dr. Daniels, and should instead make a follow up appointment with Dr. Garver in Andalusia for two weeks. Nurse Craft proceeded to make a follow up appointment with Dr. Garver for May 27, 2016.

362.   On May 21, 2016, Dr. Barber saw Plaintiff in the Jail medical office. She assessed his condition, and issued medical orders for Lasix 20 mg by mouth each morning; Bactrim DS by mouth twice per day for ten days; discontinuance of the Zyvox; discontinuance of the Lisinopril; continuation of the Norco until Plaintiff's supply ran out; and ASA (aspirin) 325 mg, one by mouth per day.

363.   On the evening of May 21, 2016, Plaintiff complained of pain in his left side. Nurse Craft provided Plaintiff with a Norco tablet for the pain. She also noted that Plaintiff had inserted a straw into his tracheostomy. She advised him to remove the straw, and not to insert foreign objects into his trach opening at any time.

364.   On May 21, 2016 and May 22, 2016, [Williams] completed a wound care flow sheet for Plaintiff's surgical wound. [She] changed Plaintiff's

dressing daily, and monitored the condition of the wound as it healed.

365.   On May 23, 2016, Nurse Craft cleaned Plaintiff's surgical wound and changed his dressing.

366.   On May 23, 2016, Dr. Barber issued medical orders to discontinue the Spiriva when the present supply was exhausted, and to continue the ipratropium bromide inhalation treatment as needed.

367.   On May 24, 2016, Nurse Craft cleaned Plaintiff's surgical wound and changed the dressing. She saw no signs of infection, and she instructed him to monitor the wound for changes in appearance.

368.   On May 25, 2016, Dr. Barber issued medical orders to discontinue Plaintiff's Xarelto, and add warfarin (a different blood thinner) 7.5 mg, once per day. She also ordered a PT/INR blood test (to measure anticoagulation) in five days.

369.   On May 26, 2016, Dr. Barber issued medical orders to hold Plaintiff's warfarin until Plaintiff's blood tests were completed.

370.   On May 26. 2016, [Williams] had Plaintiff removed from his cell for exercise and a dressing change. [She] cleaned and redressed Plaintiff's surgical wound, and administered a breathing treatment. Plaintiff requested a pain pill, and pursuant to medical orders, [she] provided him with Norco, 7.5 mg by mouth.

371.   On May 27, 2016, Plaintiff was transported for a followup office visit with Dr. Garver. After he returned to the Jail, [Williams] examined his surgical wound and changed the dressing. [She] had him taken to the Jail yard for exercise. At Plaintiff's request, [she] checked his oxygen saturation, which was 99%.

372.   On May 28, 2016, Dr. Barber saw Plaintiff in the Jail medical office. She noted that he looked better overall. She also noted that he complained about a large amount of mucous, but otherwise was slowly coming along. She issued medical orders for Mucinex, 600 mg one tablet my mouth twice per day for ten days.

373.   On May 29, 2016, Nurse Craft examined Plaintiff's surgical wound and changed the dressing.

374.   On May 31. 2016, Plaintiff submitted a Sick Call Request, stating,

"Cancer on neck, heart problem, extreme diarrhea, upset stomach, told Diana today continues tightness in chest, restless, hard to sleep (15-45 minutes) heavy fluids still out of lungs, need to get something done with eye vision (glasses)" (sic).

375. On May 31, 2016, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of diarrhea and shortness of breath. Pursuant to medical orders from Dr. Barber, [Williams] provided Plaintiff with two doses of Pepto Bismol tablets. [She] checked his oxygen saturation, which was 99%.

376. During the month of May, 2016, pursuant to medical orders issued by Dr. Barber, Plaintiff was provided the following medications: HCTZ, Ipratropium 0.02% via nebulizer, Furosemide, Gabapentin, Topiramate, Lisinopril, T-Gel shampoo, Zyrtec, Genteal eye drops, Aleve, Spiriva, Metoprolol, Augmentin, Zyvox, Norco, Bactrim DS, ASA (aspirin), Warfarin, Mucinex and Lasix.

377. On June 1, 2016, Medical received Plaintiff's Sick Call Slip of May 31, 2016. [She] noted on the slip that Plaintiff had been referred to the doctor for further evaluation and treatment.

378. On June 2, 2016, Plaintiff was seen by Nurse Craft in the Chronic Care Clinic. She checked his wound and found no signs of infection. Plaintiff informed Nurse Craft that he had not been drinking all of his Ensure. She warned him that if he was caught giving the Ensure away, it would be stopped.

379. Plaintiff was seen in the Jail medical office on June 3, 2016 by Nurse Craft. He stated that he still had diarrhea, and that the Pepto Bismol tablets had not helped. Nurse Craft informed Plaintiff that the diarrhea could be caused by taking the Ensure twice per day. Plaintiff's lung sounds were improved. The nurse noted that Plaintiff stated that he was coughing up blood, but that no blood had been seen. She provided wound care to his surgical wound. She noted that Plaintiff had become upset at pill call the night before because the nurse refused to hold his hands to feel how cold they were. At pill call, Plaintiff had requested that nurse check his oxygen saturation.  She had complied, and it was 98%.

380. On June 4, 2016, Dr. Barber saw Plaintiff in the Jail medical office. She noted that Plaintiff had a "multitude of complaints." The main complaints were: copious amounts of secretions from his tracheostomy

site, feeling tired, shortness of breath, chest pressure and diarrhea. Dr. Barber issued medical orders for a PT/INR blood test, a stool sample test, a chest x-ray, and a sputum test.

381.   On June 6, 2016, [Williams] collected specimens for all of the tests, but was unable to obtain a blood sample or stool sample. A chest x-ray was performed, and the radiologist reported that there were prominent bilateral interstitial lung markings, consistent with pulmonary edema. Dr. Barber reviewed the report, and issued medical orders to increase Plaintiff's Lasix to 40 mg twice per day.

382.   On June 7, 2016, a blood sample was obtained from Plaintiff. The laboratory report showed that Plaintiff's PT level was higher than the reference range.

383.   On June 8, 2016, Dr. Barber issued medical orders to continue Plaintiff's current Coumadin dosage, and to re-draw a PT/INR blood test in one week.

384.   On June 9, 2016, Dr. Barber issued medical orders for Potassium, 20 meq, twice per day.

385.   On June 11, 2016, Plaintiff submitted a sick call slip, stating, "Still pouring fluids from lungs, loosing weight, problem w/ vision (eyesight) Tightness in chest @ times, soreness in some joints now, still hurting behind right shoulder & side want to know all lab results" (sic). Medical received this sick call slip on June 12, 2016. Nurse Craft responded that Plaintiff had been seen by Medical on June 12, 2016, and was treated, given medical instructions and advised to alert staff if his conditions worsened. She noted that the medical response to this sick call request was documented in a Progress Note.

386.   On June 12, 2016, Nurse Craft saw Plaintiff in the Jail medical office. His pulse was 75, his oxygen saturation was 98%, his weight was 167, and his temperature was 98 degrees. Plaintiff stated, "I want to know why my last two appointments with the specialist were cancelled on June 6th." Nurse Craft noted that she could not find any appointments scheduled for June 6th or in the month of June. Plaintiff told her that he didn't eat fish or bologna, "never had and never will." He stated that he "sells an Ensure here and there." Plaintiff became upset and said, "Fuck this I will call my Federal attorney regarding Dr. Barber." Nurse Craft completed a Clinical Pathway, noting that Plaintiff's lung sounds remained

unchanged, with some rales. Dr. Barber reviewed and initialed the Clinical Pathway on June 18, 2016.

387.   On June 13, 2016, Plaintiff submitted a Grievance Form, stating: "Just found out medical didn't acknowledged cancel appointments, reschedule on June 6 as per hospital paperwork w/ Dr. Daniels & Luzt in Mobile, C/O Jackson was standing there when the appointments dates was carried, called to hospital & handed to him. I want you to know why NEITHER correctional facility or other staff were acknowledged of extended medical care. Also why the medical care to the fullest extent, due to this neglect of the medical & C/O not caring here @ Jail. Why, Follow ups aren't being done properly & as needed since it is their neglect in the first place my health is condition it is by letting it go as far as it did. Also why I haven't been to eye Dr. for glasses recommended by eye surgeon Dr. Franklin told to Diane & fax to medical numerous times. Copy made for legal reason w/ witnesses" (sic).

388.   Medical staff received the Grievance on June 14, 2016. [Williams] responded in writing, "As explained to you in sick call on 6/12/16, Dr.'s Daniel and Lutz canceled appts and gave orders to f/u w/ Dr. Garver on 5/27/16. Medical" (sic).

389.   On June 16, 2016, Plaintiff submitted a Sick Call Request, stating, "I got infected bumps breaking out under left arm (5) & 4 on belly, 1 on chest."

390.   Plaintiff submitted a Grievance Form on June 16, 2016, stating, "There was no signature for the answers, also I has been 3 months since last appt w/ Dr. Franklin (eye surgeon) call was made to Jail by Diane by C/O Coon when Dr. recommended me to have glasses done there, was told by Diane will get done local, nothing yet has been 2 faxes since to medical (Follow aren't made properly) Per sick call 6/11/16. As you state was not all addressed, fluids still pouring out of Trak (lungs heavy) weight lost, tightness in chest, eye sight (was not explained until Pm pill call then only re Dr./nothing of the other (found out by wife making call to both for truth full) to why they cancelled. Was seen by Garver Was told radiation reason for problems, never had R on lungs Then he walked out tried to talked further had to leave" (sic).

391.   Nurse Craft saw Plaintiff in the Jail medical office on June 17, 2016. She completed a Clinical Pathway for complaints of fluid, and also bumps under his left arm. Nurse Craft noted that Plaintiff's blood pressure was 120/70, his pulse was 93, respirations were 20, oxygen saturation was 985, weight was 165, and his temperature was 97.8 His skin was warm

and dry.  He was calm, his gait was steady, his abdomen was soft, his pupils were equal and reactive, and he was alert and oriented.  His pedal pulses were positive, bowel sounds were present, and his respirations were even and unlabored.

392.   On June 17, 2016, Medical received Plaintiff's Sick Call Request of June 16, 2016. Nurse Craft noted that Plaintiff had been seen on June 17; he had been treated and was advised to alert Medical staff if his conditions persisted.  She noted that she had completed a Clinical Pathway, which documented her response to Plaintiff's complaint. She also referred to  the progress note concerning this request.

393.   On June 18, 2016, Dr. Barber responded in writing to Plaintiff's grievance of June 16, 2016. She wrote: "All the above has been addressed and nothing further needs to be done for the above complaints."

394.   On June 20, 2016, Plaintiff refused to get up to take his medications at pill call.

395.   On June 21, 2016, Dr. Barber issued medical orders for chest x-rays.

396.   On June 22, 2016, [Williams] received a call at 1:30 a.m. from the Jail. Correctional officers reported to her that Plaintiff was complaining of spitting up blood from his tracheostomy. [She] instructed Jail personnel to transport Plaintiff to the emergency room. Plaintiff was transported to the emergency room for evaluation and/or treatment, and was then returned to  the Jail.

397.   On June 22, 2016, Plaintiff submitted a sick call slip stating, "I was totally exhausted this am earlier from coughing blood & hurting in right side & ER visit. At am pill call nurse or C/O no one in authority chk'd on me to why I didn't or when I awaken by several people hollering my name Capt. Hughes claiming got it on camera shaking me (someone) I  spoke w/ everyone that took meds no one touch me – seems it is a major problem here, medical cares less or C/O's" (sic). Medical received the sick call slip on June 22, 2016.

398.   On June 22, 2016, Dr. Franklin recommended that Plaintiff be seen by an optometrist for a prescription for eyeglasses. Dr. Barber issued medical orders to refer Plaintiff to Dr. Blackston, an optometrist. [Williams] made Plaintiff an appointment with Dr. Blackston.

399.    On June 22, 2016, [Williams] spoke with Dr. Barber about Plaintiff's emergency room visit. Dr. Barber issued medical orders to hold Plaintiff's Coumadin, and to repeat an INR test on June 24, 2016.

400.    On June 24, 2016, Plaintiff's PT was 16.7, and his INR was 1.4. Plaintiff informed Nurse Craft that he had missed pill call on June 20, 2016 because he was too tired to get up. Nurse Craft advised him to have a buddy who would wake him up for pill call. Nurse Craft advised Dr. Barber of Plaintiff's PT/INR. Dr. Barber issued medical orders to alternate his Coumadin dosage from 5 mg to 7.5 mg. She also ordered that his PT and INR be rechecked in one week.

401.    On June 25, 2016, medical received a handwritten note from Plaintiff that stated: "Undoubtedly you don't care to listen to any reasoning from my point. I been up for over 24 hrs coughing blood from my lungs for which ya'll care less about – that caused me to end up in Hosp. E/R. that morning due to some reason – blood thinners – to many as quoted Dr. @ ER. Why am I still coughing blood 2 days later – clots & bright red from lungs – having problem sleeping due to getting up choking on fluids & now coughing blood which I have prob 20 or more sample for attorney that ya'll care less about – or can't listen to" (sic).

402.    On June 25, 2016, Dr. Barber saw Plaintiff in the Jail medical office. Plaintiff had multiple complaints. Dr. Barber explained to him that he was coughing up small amounts of blood due to being on Coumadin (a blood thinner) due to having had a DVT. She told him that she would keep his INR between 1.5 and 2.5 because of his sensitivity to bleeding. She issued medical orders for Coumadin 5 mg, on tablet per day, and to check Plaintiff's PT/INR on Friday.

403.    On June 27, 2016, Plaintiff was transported for an appointment with Dr. Blackston. Dr. Blackston issued a prescription for glasses. [Williams] then faxed the prescription to a laboratory.

404.    In the month of June, 2016, pursuant to doctor's orders, Plaintiff was administered the following medications: HCTZ (hydrochlorothiazide, for high blood pressure), Ipratropium (a bronchodilator), Lisinopril (for high blood pressure), furosemide ((for fluid retention), gabapentin (for nerve pain), metoprolol tartrate (for blood pressure and chest pain), Potassium CL ER (a mineral supplement), Topiramate (for headaches), Aleve (for pain), Coumadin (warfarin, a blood thinner, to prevent blood clots), Bactrim (an antibiotic), Mucinex (for chest congestion), Lasix (a

blood thinner to prevent blood clots), Genteal eye drops, and Zyrtec (an antihistamine). He was provided a replacement voice prosthesis, T-Gel shampoo, his INR was checked, and he was administered weekly blood sugar checks to monitor his diabetes.

405.   On July 1, 2016, Plaintiff was seen by [Williams] in the Chronic Care Clinic. His blood pressure was 120/80, his temperature was 97.6, is pulse was 72, and his respirations were 20. Plaintiff's PT was 17.0, and his INR was 1.4. Nurse Craft notified Dr. Barber, who issued medical orders to maintain the current Coumadin dosage and to recheck Plaintiff's PT/INR in one week.

406.   On July 4, 2016, Plaintiff submitted a sick call slip, stating "Cramping, diariaha [*sic*], can't seem to maintain weight" (sic). Medical received this slip on July 5, 2016.

407.   On July 6, 2016, Plaintiff was seen in the Jail medical office by me for complaints of diarrhea. [Williams] completed a Clinical Pathway form. [She] noted that Plaintiff's blood pressure was 102/78, his pulse was 69, his respirations were 18, his oxygen saturation was 99%, and his temperature was 98.1. [She] referred Plaintiff to the Jail doctor for his complaints.

408.   On July 8, 2016, Plaintiff's PT was 15.0, and his INR was 1.2. Nurse Craft notified Dr. Barber, who issued medical orders to alternate Coumadin doses of 5mg one day, then 5 mg for one day, then 7.5 mg for one day, in sequence. Dr. Barber also issued medical orders to recheck Plaintiff's PT/INR on July 15, 2016.

409.   On July 8, 2016, Plaintiff was transported to an appointment with Dr. Garver.

410.   On July 9, 2016, Dr. Barber saw Plaintiff in the Jail medical office. Plaintiff complained of diarrhea and cough and congestion. He also expressed concern about the cardiologist's findings. Dr. Barber informed Plaintiff that she would review the cardiologist's notes.

411.   On July 12, 2016, Plaintiff submitted a sick call slip stating, "Was handed the glasses by Nurse Diane this pm, tried them on to see the by focal was way [too] close together, [too] low, [too] small, frames was not the same ones they took measurements on, frames don't set proper, got a smart ass comment from her, figure they would not be right – had wife to call Dr. Blackston off. Am to assure something will get

done, hand glasses back am 7/13/16" (sic). Medical received the sick call slip on July 13, 2016.

412.   On July 13, 2016 at pill call, Plaintiff handed his glasses to Nurse Craft, stating that he could not see through them, and that they were made wrong. He stated that he was sending a letter to his lawyer because the frames were too big.

413.   On July 15, 2016, Nurse Craft noted that Plaintiff's PT was 164, and his INR was 1.4. Dr. Barber issued medical orders to alternate Plaintiff's dosage of Coumadin as 5 mg, then 5 mg, then 7.5 mg, then to repeat the dosing sequence.

414.   On July 18, 2016, Plaintiff submitted a sick call slip stating, "2nd request 4 heart follow-up to get results & 2nd opinion on all those blood thinners, also eye Dr. to get glass's prescription straightened out so I can read w/o the cross eye by focals, so small, close to nose, not covering the eye fully to low on glass's been coughing heavy flem [*sic*] w/ blood mix since then showed Diane" (sic).  Medical received the slip on July 18, 2016.

415.   On July 19, 2016, Plaintiff was seen by Nurse Craft in the Jail medical office for sick call. He complained of coughing. He also informed Nurse Craft that he could not see out of his glasses. Nurse Craft informed Plaintiff that the glasses were a new prescription. Plaintiff took the glasses, and stated he would have his wife take them back to Dr. Blackston's office. Plaintiff stated that he wanted a second opinion regarding his blood thinner medication. Nurse Craft informed him that he had an upcoming follow-up appointment with the cardiologist, and could address the issue at that time.

416.   On July 22, 2016, Plaintiff's PT was 16.3, and his INR was 1.4. Dr. Barber issued medical orders to continue the same Coumadin dosing schedule, and to recheck Plaintiff's PT/INR on July 29, 2016.

417.   On July 23, 2016, Dr. Barber issued medical orders to monitor Plaintiff's fasting blood sugar weekly.

418.   On July 25, 2016, [Williams] was informed that Plaintiff's wife had taken his glasses to Dr. Blackston's office. [Williams] was informed by Dr. Blackston's office that they would return the glasses to the lab for inspection. [She] informed Plaintiff that his wife needed to bring the

glasses back.

419.   On July 26, 2016, Plaintiff was transported to Dr. Price's office for a follow-up appointment.

420.   On July 26, 2016, Dr. Barber issued medical orders for isosorbide dinitrate, 20 mg, one tablet twice per day.

421.   On July 27, 2016, Dr. Barber issued medical orders to change the Isosorbide to extended release, 30 mg per day.

422.   On July 27, 2016, Plaintiff submitted an "Patient Request Form," directed to the Sheriff and the Chief Jailer, stating, "Why is it proper medical attention can't be had in this facility by these nurse, be denied to see Dr., thinking they are qualified to diagnose problems, as speclist, & believe they can correct someone eyesight by guessing at the problem instead of proper attention. I have requested twice already to see Dr. Barber to get to eye Dr. to get glasses properly fitted as they weren't right" (sic). The request was forwarded to medical, and on July 30, 2016, Nurse Craft wrote the following reply: "You were told 7/26/16 by CO Jackson and by med on the 27th to have your wife bring glasses back to the facility so medical can mail your glasses back to the lab to be checked and be corrected."

423.   On July 29, 2016, Plaintiff was transported to Dr. Franklin's office for an eye clinic appointment.

424.   On July 29, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR in one week, and to continue his current Coumadin dosage.

425.   On July 30, 2016, Plaintiff submitted a sick call slip, stating, "Burning in Throat & sinuses, irritation since ride w/ c/o smoking going to Monroeville & back, not giving a damn about health issues – Also something done about cancer in neck, it has been 6 months since it & pet scans to follow up that as needed, 3rd request to see Dr. denied, this is 4th request" (sic).

426.   On July 31, 2016, medical received Plaintiff's sick call request. I noted on the form that I had referred Plaintiff to be seen by the Jail doctor.

427.   On July 31, 2016, Dr. Barber issued medical orders to check Plaintiff's HbA1C (90 day blood sugar) level and Potassium level yearly.

428.   In the month of July, 2016, pursuant to doctor's orders, Plaintiff was administered the following medications: Ipratropium (a bronchodilator), Lisinopril (for high blood pressure), furosemide (for fluid retention), gabapentin (for nerve pain), metoprolol tartrate (for blood pressure and chest pain), Potassium CL ER (a mineral supplement), Topiramate (for headaches), Aleve (for pain), Warfarin (a blood thinner, to prevent blood clots), Isosorbide (for chest pain), Genteal eye drops, and Zyrtec (an antihistamine). He was provided T-Gel shampoo, and was administered weekly blood sugar checks to monitor his diabetes.

429.   On August 1, 2016, [Williams] saw Plaintiff in the Chronic Care Clinic. Plaintiff's blood pressure was 110/70, his temperature was 98.6, his pulse was 80, and his respirations were 18. [She] noted that he was on a diabetic diet.

430.   On August 5, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on August 12, 2016, and to continue the same medications dosages.

431.   On August 6, 2016, Plaintiff was seen by Dr. Barber in the Jail medical office. Plaintiff complained of a sore lymph node on the left side of his neck, with vessels getting enlarged.   Dr. Barber ordered an ultrasound of Plaintiff's neck.

432.   On August 8, 2016, pursuant to medical orders from Dr. Barber, an ultrasound was performed on Plaintiff's neck. Dr. Marc Awobuluyi reported that no discrete mass or fluid collection was seen. Dr. Barber reviewed and initialed the report on August 12, 2016.

433.   On August 12, 2016, Plaintiff notified Nurse Craft that he had coughed up some blood tinged sputum. She saw him in the Jail medical office, and noted no abnormal bleeding or bruising.

434.   On August 12, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on August 19, 2016, and to continue the same Coumadin dosages.

435.   On August 13, 2016, Plaintiff informed Nurse Craft that he wanted something done with his glasses. Nurse Craft directed him to have his wife bring his glasses back to the Jail facility, and they would be sent back and checked for any flaws. Plaintiff stated that his wife had brought them,

and Nurse Craft informed him that the glasses had not been brought back to medical.

436.   On August 17, 2016, Plaintiff submitted a sick call slip, stating, "Shelton is in need of referred to specialist, oncologist, ENT for his neck as per PET scan, also he needs to know what is causing headaches, light head[ed]ness, problems, need copy of medications he is taking & what they are for (already approved by Dr. Barber), also want a copy of the receipt scan taken of neck & allow to be read by him" (sic). Plaintiff attached a copy of the PET scan report to his sick call request.   On the report was hand-written, "We are requesting ENT, R oncologist to take closer look @ Mr. Foster's neck, he has been requested to attached this along with ya'll medical request w/ witnesses there, & mail back to attorney Thanks Attorney N Reference" (sic).

437.   On August 19, 2016, Nurse Craft saw Plaintiff in the Jail medical office. She noted that Plaintiff's PT was 1.7, and his INR was 1.4. She also noted that he was taking alternating doses of Coumadin, 5 mg one day, followed by 5 mg for one day, then 7.5 mg for one day, in sequence. She observed no signs or symptoms of abnormal bleeding. Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on August 26, 2016, and to continue the same Coumadin dosage.

438.   On August 20, 2016, Dr. Barber noted that she was not going to order a PET scan yet because Plaintiff was not yet over his lung surgery, and they probably would not do anything yet with the findings of a PET scan.

439.   On August 21, 2016, Nurse Craft notified Dr. Barber that Plaintiff wanted an extra mat.  Dr. Barber stated that there was no medical need for a double mat at that time.

440.   On August 22, 2016, Plaintiff submitted a sick call slip, stating, "Migraine headaches are getting worst , seen by nurse 8/19/16 noting done for headaches, also requested her to see Dr. Barber 8/22/16 about cancer in neck, denied excess to her, more delays in healthcare, neck has already been life threatening to me with 4 surgeries, numerous radiation treatments, a specialist is needed to make sure this does not proceed further – I have tender spot on y neck, also a knot now neck to spine on back of neck, I also been refused to read the scan report, R see medical record again pertaining to the scan taken Nurse told me corporate rules, would have to approve me to get a copy or  to read the scan of my neck taken also still being refused list of medications & what they a for (Dr. Barber approved this)" (*sic*). He

added, "Copy mailed to attorney this date."

441.   On August 22, 2016, medical received Plaintiff's sick call slip. [Williams] noted that [she] had referred Plaintiff to be seen by the doctor.

442.   On August 26, Nurse Craft noted that Plaintiff's PT was 15.7, and his INR was 1.3. She also noted that he was on a Coumadin schedule of 5mg per day, then 5 mg per day, then 7.5 mg per day in sequence.

443.   On August 26, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on September 2, 2016. She also issued orders to continue Plaintiff's same Coumadin dosage.

444.   On August 27, 2016, Dr. Barber saw Plaintiff in the Jail medical office. She noted that he had multiple complaints and was concerned about recurrent throat cancer and posterior headaches. She issued medical orders to increase Plaintiff's dosage of Topamax to 75 mg by mouth, twice per day. She also ordered a PET scan to assess for recurrent throat cancer.

445.   On August 30, 2016, Nurse Craft saw Plaintiff in the Jail medical office for complaints of chest pain. She noted that blood pressure was 148/64, and his oxygen saturation was 98%. Plaintiff informed her that the pain did not radiate, and that it passed after five minutes. She noted that Plaintiff showed no signs of acute distress. Nurse Craft contacted Dr. Barber, who ordered that Plaintiff's blood be drawn and tested for cardiac enzymes due to Plaintiff's complaints of chest pain. She also ordered Protonix, 40 mg, one tablet by mouth per day, and Maalox, 30 cc by mouth, in a single dose.

446.   On August 31, 2016, Nurse Craft saw Plaintiff in the Jail medical office for complaints of chest pain. Plaintiff informed Nurse Craft that the pain was in the center of his chest, and did not radiate. He described it as a stabbing pain that lasted about five minutes. Nurse Craft noted that Plaintiff's temperature was 97.5, his pulse was 77, and his respirations were 20. His blood pressure sitting was 180/100, and standing was 180/108. Plaintiff stated that he felt dizzy and that it passed almost as quickly as it came. He stated that he felt like he was going to pass out, and felt dizzy and weak. He also informed Nurse Craft that he had not been drinking his Ensure, and had it put back in his cell.

447.   At 11:36 p.m. on August 31, 2016, [Williams] received a call from a correctional officer that Plaintiff was complaining of shortness of breath.

[She] instructed the officer to check Plaintiff's oxygen saturation and administer him a breathing treatment. The correctional officer informed me that Plaintiff's oxygen saturation was 99%, and that Plaintiff had refused a breathing treatment. Later that morning, [Williams] contacted Dr. Price's office, and was instructed that if the dizziness continued, to draw cardiac enzymes and/or take Plaintiff to the emergency room.

448.   In the month of August, 2016, pursuant to doctor's orders, Plaintiff was administered the following medications: Ipratropium (a bronchodilator), Lisinopril (for high blood pressure), furosemide ((for fluid retention), gabapentin (for nerve pain), metoprolol tartrate (for blood pressure and chest pain), potassium CL ER (a mineral supplement), Topiramate (for headaches), Aleve (for pain), Warfarin (a blood thinner, to prevent blood clots), Isosorbide (for chest pain), and Zyrtec (an antihistamine). He was provided T-Gel shampoo, and was administered weekly blood sugar checks to monitor his diabetes.

449.   On September 1, 2016, at 7:00 a.m., Plaintiff appeared at his cell door for pill call, and Nurse Craft noted that he made no medical complaints.

450.   On September 2, 2016, Plaintiff requested that Nurse Craft check his blood pressure. She noted that it was 88/54. Nurse Craft notified Dr. Barber, and informed her that Plaintiff was complaining of dizziness. She also noted that his blood pressure was 90/60 after sitting for five minutes, and that it was 100/60 when he was standing. She noted that he was in no acute distress. Dr. Barber issued medical orders for Coumadin, 7.5 mg daily and she also ordered a recheck of Plaintiff's PT/INR in one week.

451.   On September 3, 2016, Dr. Barber reviewed the laboratory report from Plaintiff's blood test of August 30, 2016.

452.   On September 5, 2016, Plaintiff submitted a sick call slip, stating, "Blood pressure spikes/drops, headaches, lighthead[ed]ness, need proper medical attention, fed up w/ guessing games w/ my life want to see a doctor y'all enough to cause stress w/ lies." He added: "Copy w/ witness sent to attorney to amend suit get T.J.T." (*sic*). Medical received the slip on September 6, 2016.

453.   On September 7, 2016, [Williams] saw Plaintiff in the medical office for sick call and for Chronic Care Clinic. His blood pressure was 100/84, his temperature was 97.3, heart rate was 81, respirations were 18, and oxygen saturation was 99%. Plaintiff complained of dizziness,

headaches, and fluctuating blood pressures. [Williams] noted that Plaintiff's labs had been done on August 20, 2016. [She] also noted that Plaintiff was under the care of a cardiologist and was scheduled for a follow-up visit.

454.   On September 9, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on September 16th, 2016. She also ordered to continue Coumadin 7.5mg, one tablet daily.

455.   On September 9, 2016, pursuant to medical orders from Dr. Barber, a whole body PET/CT scan was performed on Plaintiff. The scan was interpreted by Dr. Jeffrey Adams, who reported a cavitary area in the right lung base posteriorly. The area appeared to involve the pleura with some fluid and some pleural thickening. It appeared to Dr. Adams that the area had improved, with only mild uptake at the periphery of the area of cavitation. He noted that no areas of suspicious uptake were seen otherwise. Dr. Barber reviewed the report on September 24, 2016.

456.   On September 10, 2016, Dr. Barber issued medical orders for Neurontin, 800 mg once per day.

457.   On September 14, 2016, Plaintiff submitted a hand-written statement to Medical, detailing complaints that his bifocals were too low, too small, and too close together. He added that he had headaches from having to lean his head back too far, and that his left eye had not been right since his retinal separation.

458.   On September 16, 2016, Nurse Craft saw Plaintiff in the Jail medical office. She noted that Plaintiff's PT was 17.8, his INR was 1.5, and that he took Coumadin 7.5 mg by mouth every evening at bedtime. She noted that she observed no signs or symptoms of abnormal bleeding.

459.   On September 16, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on September 23th, 2016. She also ordered to continue Coumadin 7.5mg, one tablet by mouth at bedtime.

460.   On September 19, 2016, Dr. Barber issued medical orders to increase Plaintiff's Isosorbide to 60 mg per day.

461.   On September 20, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on September 30th, 2016. She also ordered to continue Coumadin 7.5mg, one tablet by mouth at bedtime.

462.   On September 23, 2016, Nurse Craft noted that Plaintiff was late receiving his medications. She noted that Plaintiff's PT was 17.8, his INR was 1.5, and that he was receiving 7.5 mg of Coumadin.

463.   On September 24, 2016, [Williams] checked Plaintiff's blood pressure, which was 80/60. [She] contacted Dr. Barber and informed her that Dr. Price had increased Plaintiff's dosage of isosorbide. Dr. Barber issued medical orders to decrease Plaintiff's isosorbide back to 30 mg daily.

464.   On September 25, 2016, [Williams] checked Plaintiff's blood pressure, which was 90/60. Plaintiff refused to have his blood sugar checked. He would not give a reason, and would not sign a Refusal of Medical Treatment form.

465.   On September 27, 2016, Nurse Craft conducted an annual history and physical examination of Plaintiff. She noted that his skin color was normal, with good turgor, his pupils were equal and reactive, his hearing was adequate, and the mucous membranes in his mouth were moist and pink. His nose was clear, his neck was soft, his breath sounds were clear, and his heart rate was regular. His pedal pulses were positive, with no edema. His abdomen was soft and nontender, bowel sounds were present, and his urine was clear and without odor. His pulse was 69, blood pressure was 90/66, temperature was 98.5, respirations were 20, and oxygen saturations was 99%.

466.   On September 28, 2016, Plaintiff submitted a sick call slip, stating, "Sinuses running pouring coughing blood, something in right eye I told C/O Jackson & Sgt Scott to tell nurse yesterday" (*sic*).

467.   On September 29, 2016, [Williams] saw Plaintiff in the Jail medical office. Plaintiff complained of spitting up blood. [Williams] completed a Clinical Pathway form. [She] noted that Plaintiff's blood pressure was 132/82, his pulse was 66, his respirations were 18, his oxygen saturation was 97%, and his temperature was 98. He was calm with a steady gait, his respirations were even and unlabored, and his skin was warm. [Williams] noted that Plaintiff was coughing up thick sputum tinged with blood. [She] also noted that he had an established stoma from a tracheotomy, and that his prosthesis had been changed on September 24, 2016. [She] contacted Dr. Barber, who issued medical orders for Keflex 500 mg, one tablet by mouth twice per day for seven days, and Mucinex 200 mg, two tablets twice per day for five days. Dr. Barber issued medical orders to hold Plaintiff's Coumadin for one night, and to check his INR as scheduled on September 30, 2016.

468.  On September 30, 2016, Dr. Barber issued medical orders to recheck Plaintiff's PT/INR on October 7, 2016. She also ordered to continue Coumadin 7.5mg, one tablet by mouth at bedtime.

469.  In the month of September, 2016, pursuant to doctor's orders, Plaintiff was administered the following medications: Ipratropium (a bronchodilator), Lisinopril (for high blood pressure), furosemide ((for fluid retention), gabapentin (for nerve pain), metoprolol tartrate (for blood pressure and chest pain), Potassium CL ER (a mineral supplement), Topiramate (for headaches), Aleve (for pain), Warfarin (a blood thinner, to prevent blood clots), Protonix (for acid reflux), Neurontin (for nerve pain), Isosorbide (for chest pain), Keflex (an antibiotic), Mucinex (for chest congestion), and Zyrtec (an antihistamine). He was provided a replacement voice prosthesis, T-Gel shampoo, and was administered weekly blood sugar checks to monitor his diabetes.

470.  On October 6, 2016, Dr. Barber issued medical orders to discontinue the INR test on October 7, 2016. She also ordered for Plaintiff a flu vaccine, to recheck his PT/INR on October 14, 2016, and to continue Coumadin 7.5mg by mouth at bedtime.

471.  On October 6, 2016, Nurse Craft saw Plaintiff in the Chronic Care Clinic. She administered a flu vaccination. Later that morning, she was notified that Plaintiff had fallen. She went to his dorm, and observed Plaintiff sitting on a bench at a table. She checked his vital signs, and noted that his temperature was 98.4, his pulse was 89, respirations were 20, blood pressure was 130/80. He informed her that he had felt dizzy but had not passed out, but everything had gone black.

472.  On October 9, 2016, Plaintiff refused to have his blood sugar checked. He did not give a reason for the refusal and would not sign a Refusal of Medical Treatment Form.

473.  On October 12, 2016, Plaintiff submitted a sick call slip, stating, "Feet feels like pins needles sticking in them top & bottom last couple days, Bad headaches yesterday, lightheaded (fell) ck on glasses need to go over results Pet scan 9/9/16" (*sic*).

474.  On October 12, 2016, Plaintiff was transported to an appointment with Dr. Price, the cardiologist.

475.  On October 13, 2016, Nurse Craft spoke with Dr. Price's office. She was

informed that Dr. Price was planning to perform a "heart cath" (cardiac catheterization), and would let her know when it would be scheduled.

476.     On October 14, 2016, Nurse Craft saw Plaintiff in the Jail medical office. Plaintiff complained of feeling like pins and needles in his feet. He also complained of some resistance when urinating. He inquired about the status of his glasses. Nurse Craft noted that Plaintiff was taking the medication Neurontin for nerve pain. She noted that his PT had been reported as 20.1, and his INR was 1.7. She observed no signs of abnormal bleeding. She notified Dr. Barber of Plaintiff's complaints.

477.     On October 14, 2016, Dr. Barber issued medical orders to continue Coumadin, and to recheck Plaintiff's in one week. She also ordered Flomax 0.4mg by mouth, one tablet at bedtime for the urinary problems.

478.     On October 15, 2016, Dr. Barber saw Plaintiff in Chronic Care Clinic. She noted that he was sleepy and lethargic. He stated that he had passed out four times since October 6, 2016. Dr. Barber noted that Plaintiff had seen the cardiologist, who wanted to perform a cardiac catheterization procedure. 483.  On October 16, 2016, Nurse Craft was informed that Plaintiff had passed out. She went to his cell block and observed Plaintiff sitting. She checked his vital signs. His heart rate was 94, blood pressure sitting was 98/76, oxygen saturation was 97%. She instructed him not to stand for long periods of time.

Doc. 72-1, Exh. 1.


## (3)  Suit Against Defendants in their Official Capacities

Defendants Meeks and Hughes assert that they are absolutely immune from suit.

To the extent Foster sues defendants Meeks and Hughes in their official capacities, they

are immune from monetary damages.[6]  Official capacity lawsuits are "in all respects other

than name, . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159,

---

[6] Under all facets of Alabama law, a county sheriff, his jailers, and medical staff act as state officers "when supervising inmates and otherwise operating the county jails."  *Turquitt v. Jefferson County*, 137 F.3d 1285, 1289 (11th Cir. 1998); *see* Ala. Const. Art. V, §112 (designates sheriff and, by extension, his staff as members of State's executive department);  *see also Parker v. Amerson*, 519 So. 2d 442 (Ala. 1987) (county sheriff is executive officer of the state).

166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.

### (4)  Deliberate Indifference to Health

Foster asserts that Meeks and Hughes acted with deliberate indifference to his health because they did not intervene on his behalf or provide him adequate medical treatment. [7]  Specifically, he argues that the defendants should have arranged for a different mode of medical care other than that prescribed by medical personnel.  In addition, he argues that they ignored or failed to respond promptly to his requests for medical assistance.  These assertions entitle Foster to no relief.  The court likewise

---

[7] The pleadings indicate that the actions which form the basis of the Amended Complaint occurred during Foster's incarceration in the Covington County Jail as a detainee on capital murder charges pending trial in the Circuit Court of Covington County.  The Fourteenth Amendment, rather than the Eighth Amendment, provides the appropriate standard for assessing whether the alleged denial of medical treatment and conditions of confinement imposed upon a pretrial detainee are violative of the Constitution. *Bell v. Wolfish*, 441 U.S. 520 (1979).  However, for analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment. *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985).

concludes that, even if the court were to assume arguendo that the plaintiff exhausted his claims against the medical defendants, the medical defendants would also be entitled to summary judgment as the plaintiff has failed to present a genuine dispute of material fact with respect to his assertion that the defendants acted with deliberate indifference to his health.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams,* 221F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice - negligence by a physician - is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v.Gamble*, 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct,

and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to set forth a cognizable claim of "deliberate indifference to [a] serious medical need . . ., Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009). In other words, when seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner's health or safety).  Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  This is likewise true for a claim reviewed under the objective reasonableness standard.  Thus, to proceed on a claim challenging the constitutionality of medical care under either standard of review, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of

medical judgment.  *Estelle*, 429 U.S. at 104-97, 97 S.Ct. 285.  An allegation of negligence is insufficient to state a due process claim.  *Daniels v. Williams*, 474 U.S. 327, 330-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). . . ."  *Simpson v. Holder*, 200 F.App'x 836, 839 (11th Cir. 2006); *Kingsley*, --- U.S. ---, 135 S.Ct. 2466, 2472 (2015) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1999)) (It is well-settled "[t]hat . . . 'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'"); *Estelle*, 429 U.S. at 106 (neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 835, 836, 114 S.Ct. 1970 (A complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.);  *Daniels*, 474 U.S. at 332 (The Constitution "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries. . . . We have previously rejected reasoning that would make of the Fourteenth a font of tort law to be superimposed upon whatever systems may already be administered by the States."); *Kelley v. Hick*s, 400 F.3d 1281, 1285 (11th Cir. 2005) ("Mere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate complaint alleging "misdiagnosis and inadequate treatment [as such] involve no more than medical negligence."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of

an ailment."); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (negligence in misdiagnosis of pituitary tumor not sufficient to show deliberate indifference); *Barr v. Fla. Dept. of Corr.,* 2011 WL 1365552, at *4 (S.D. Fla. April 11, 2011) (plaintiff due no relief where misdiagnosis, which led to improper insertion of feeding tube, did not rise to the level of deliberate indifference as misdiagnosis amounted to nothing more than negligence); *Null v. Mangual*, 2012 WL 3764865, at *3-4 (M.D. Fla. Aug. 30, 2012) (Misdiagnosis of inmate with Ganglion cyst that "was eventually diagnosed as synovial sarcoma, a form of skin cancer [leading to a later discovery of] multiple spots of cancer on his lungs . . . fail[ed] to show that Defendants acted with deliberate indifference as opposed to mere negligence. . . .  At most, [Defendants] misdiagnosed Plaintiff's growth, which amounts to a claim of negligence or medical malpractice."); *Payne v. Groh*, 1999 WL 33320439, at *5 (W.D. N.C. July 16, 1999) (citing *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986)) ("An allegation of misdiagnosis, even when accompanied by a speculative allegation of subjective intent, amounts only to the state-law tort of medical malpractice, not to a tort of constitutional magnitude for which Section 1983 is reserved. Conclusory allegations sounding in malpractice or negligence do not state a federal constitutional claim.").  Consequently, mere accidental inadequacy, negligence in diagnosis, negligence in treatment, and medical malpractice do not suffice to establish the objective component of claims seeking relief for alleged constitutional violations regarding medical treatment provided to an inmate.

Furthermore, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference' . . .

which is in turn defined as requiring two separate things 'awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]'" *Taylor*, 221 F.3d at 1258 (internal citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Additionally, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291; *Man*del, 888 F.2d at 787. Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); Waldrop, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that the defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.").

Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d at 1545; *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).  Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990); *Scott*, 550 U.S. at 380.

Defendants Meeks and Hughes aver that they are not in any way involved in decisions regarding medical treatment provided to inmates, that "Covington County contracts with third-party medical provider Southern Health Partners to provide comprehensive services to inmates at the Jail" and that "[w]hen Southern Health Partners is unable to provide specialty care that an inmate needs, Southern Health Partners notifies [the Sheriff] and/or the jail administrator and arrangements are made for the inmate to be transported to an outside specialist."   Correctional Defs' Exh. B – Doc. 71-2; *see* Correctional Defs.' Exh. A - Doc. No. 71-1 ("During Plaintiff's tenure at the Covington

County Jail, he has experienced various medical issues and, as a result, has been examined and treated by Southern Health Partners staff on numerous occasions…. If an inmate needs medical attention, they can file a request to see a Southern Health Partners nurse."). Thus, medical decisions are delegated to Southern Health Partners and/or medical specialists outside the facility.

Foster has failed to establish deliberate indifference on the part of Meeks and Hughes. Specifically, Foster has not demonstrated that the correctional defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Foster's health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).

Insofar as Foster seeks to hold defendants Meeks and Hughes liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner

94

care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.*, 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen, et al.*, 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).  Defendants Meeks and Hughes are therefore entitled to summary judgment on Foster's claims that they acted with deliberate indifference to his health by delaying or denying him adequate medical treatment.

### D.  The State Law Claims

If the federal claims over which the Court has original jurisdiction are dismissed, the court may decline to exercise jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3); *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002).  As discussed above, all of the federal claims merit dismissal.  Thus, the Court may (and in this case should) decline jurisdiction over the state law claims for contempt, fraud, negligence, and outrage.[8]

### E.  The Request for Release on Bond

Foster is an elderly man with numerous health problems who has been confined in the Covington County Jail as a pretrial detainee on capital murder charges for four years. It appears that both Southern Health Partners and Covington County have expended numerous resources in their efforts to provide medical care to this pretrial detainee and that the plaintiff wishes to receive medical treatment from specialists outside the jail.

---

[8]  Foster also references Section 1983 within his outrage claim.  The tort of outrage, however, is not cognizable in a Section 1983 action.

Throughout the Amended Complaint, Plaintiff's counsel repeatedly requests for Foster to be released on bond. *See* Doc. 56, Amended Complaint, p. 4 ("[H]e seeks EMERGENCY RELIEF [from] this Honorable Court including but not limited to transferring him to a different county, the State or Alabama or the State of Alabama Department of Corrections or a hearing on the issue of his time served and being able to be released for time served or 'bond out' of the Covington County Jail due to the number of constitutional violations he alleges in this matter and his obvious declining health as the major proof."), p. 5 ("the Plaintiff inmate requests for this Honorable Court to research its power and authority to Order that he be able to 'Bond Out' of this non-compliant facility. . . ."); p. 13 ("The Plaintiff has been caused to suffer in an *in humane* (*sic*) and *outrageous* manner while incarcerated in the Covington County Jail, and being denied the ability to make a normal [] 'BOND' the past four (4) years. . . ." (emphasis in original); p. 14 (This action seeks . . . such **equitable or other relief** this Honorable Court deems appropriate, including . . . setting a reasonable 'BOND" . . . .") (emphasis in original); p. 15; (Plaintiff requests the court to "release the Plaintiff Inmate or transfer him to another facility or set a reasonable legal and constitutional appearance 'BOND', etc. . . . ."). It is clear from the facts as alleged in the Amended Complaint and Foster's numerous requests to be released on bond that the plaintiff primarily seeks to petition for a writ of habeas corpus to effect his release from the Covington County Jail and/or the custody of the Sheriff pending his criminal trial in order to receive medical treatment from specialists outside the jail facility. This court, however, does not have jurisdiction to

enter an order to set bond pending trial in a state criminal proceeding.[9]   In addition, a request for a petition for a writ of habeas corpus is not cognizable under section 1983.  To the extent Foster seeks to petition the court for a writ of habeas corpus, this request is due to be DISMISSED without prejudice for him to seek relief in the appropriate court.

## III.  CONCLUSION

Accordingly, it is the

RECOMMENDATION of the Magistrate Judge as follows:

(1)    The Motion to Dismiss filed by Southern Health Partners and Williams be GRANTED. Doc. 60.

(2)    The Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) filed by Defendants Meeks and Hughes be DENIED.  Doc. 59.

(3)    The Motion for Summary Judgment filed by Defendants Meeks and Hughes be GRANTED. Doc. 70.

(4)    The Motion for Summary Judgment filed by the medical defendants be DENIED as moot. Doc. 72

(5)    To the extent Foster petitions for a writ of habeas corpus, the request is DISMISSED without prejudice.

(6)    The state law claims be DISMISSED without prejudice.

(7)    The remaining claims against the defendants be DISMISSED with prejudice.

---

[9] *See* Ala.R.Crim.P. 7.2.

(8)     The costs of these proceedings be taxed against Plaintiff.

Finally, it is

ORDERED that the parties shall file any objections to the said Recommendation on or before February 21, 2017.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 3rd day of February, 2017.


            /s/Terry F. Moorer
        TERRY F. MOORER
        UNITED STATES MAGISTRATE JUDGE